[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-11954

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 13, 2011
JOHN LEY
CLERK

D. C. Docket No. 02-02896-CV-TWT

ERIC LYNN FERRELL,

Petitioner-Appellant,

versus

HILTON HALL, Warden,
Georgia Diagnostic and
Classification Prison,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(May 13, 2011)

Before TJOFLAT, MARCUS and BLACK, Circuit Judges.

MARCUS, Circuit Judge:

Petitioner Eric Lynn Ferrell ("Ferrell") was sentenced by a state trial court in Georgia to die following his convictions on two counts of malice murder for the fatal shootings of his grandmother and fifteen-year-old cousin. The Georgia Supreme Court, on direct appeal and during collateral habeas proceedings, rejected all of Ferrell's attacks on his convictions and sentence. Thereafter, a federal district court denied Ferrell's petition for writ of habeas corpus, including his claims that trial and appellate counsel were ineffective in failing to conduct a reasonable investigation for mitigating evidence; that trial counsel's penalty-phase closing argument also was ineffective; that his right to conflict-free trial counsel was wrongfully denied; and, finally that Ferrell was constructively absent from the penalty phase of his trial.

After thorough review of this ample record, we are compelled to reverse in part the judgment of the district court. We hold that the state court's rejection of Ferrell's ineffective-assistance claims was an unreasonable application of Strickland v. Washington, and, accordingly, we reverse the district court's denial of habeas relief from Ferrell's death sentence. Neither the jury nor the sentencing judge was ever told, because defense counsel never discovered that Ferrell suffers from extensive, disabling mental health problems and diseases including organic brain damage to the frontal lobe, bipolar disorder, and temporal lobe epilepsy. Nor

2

did they learn that the defendant had attempted suicide at age eleven, or that because of these mental health issues, Ferrell exhibits increased impulsivity and decreased sound judgment; that his conduct was not entirely volitional; or that his judgment and mental flexibility were significantly impaired by organic brain damage. Nor, finally were they ever told that Ferrell's father was physically abusive to his children, especially to Ferrell, waking them in the middle of the night to beat them (sometimes after stripping them naked) with razor strops, fan belts, and old used belts; that the family was repeatedly evicted from their homes and hungry, and lived in fear of those to whom the father owed gambling debts; or that Ferrell's mother suffered from clinical depression, suicidal ideations, rage blackouts, and urges to physically injure her children.

Since we grant habeas relief concerning the death penalty, we have no occasion to address Ferrell's remaining penalty-phase claims. Finally, we are unpersuaded by Ferrell's claim that he was otherwise unconstitutionally encumbered by conflict-ridden counsel.

## I.

### A. The Murders and the Guilt Phase of Ferrell's Trial

This tale of murder and abuse began on the night of December 29, 1987, when Eric Lynn Ferrell spent the evening at his grandmother's home along with

his grandmother, Willie Myrt Lowe, and his cousin, Tony Kilgore. (RE43 at 554, 632-33).[1] At around 5:30 a.m. the next morning, Ferrell left Mrs. Lowe's home and returned to his mother's house, where he lived. (RE43 at 554).

Later that morning Ferrell called to ask a friend, Barry Wise, for a ride to Ferrell's probation officer to pay his overdue probation fees. (RE43 at 579, 615). While on route, Wise saw Ferrell with a "wad of money," and heard Ferrell explain that the money had come from the police for loss of income after a lawsuit. (RE43 at 579, 615). Ferrell paid the fees to his probation officer, who had previously threatened to revoke Ferrell's probation and incarcerate him if he did not pay up. (RE43 at 600). Wise described the Petitioner as acting "real hyper" and "upset" that morning. (RE43 at 579).

In the interim, shortly before noon, one of Mrs. Lowe's daughters, Annie Fallen, stopped by Mrs. Lowe's house to pick up her mother for an appointment. (RE10 at 848-49). She and a neighbor discovered the bodies of Mrs. Lowe and fifteen-year-old Tony Kilgore in a bedroom where they had been murdered. Both Willie Myrt Lowe and Tony Kilgore had been shot twice in the head at contact range and were dead. Tony Kilgore's head was found resting on a pillow

---

[1] Citations to the district court's docket are denoted by "D"; citations to Respondent's Exhibits in the district court are denoted by "RE" and the exhibit number, followed by page number (e.g., "RE43 at 7").

4

indicating that he was asleep, and never disturbed, when he was shot. (RE11 at 1178-82, 1221-22). Mrs. Lowe suffered two gunshot wounds to the head. Her dress was torn and two buttons were detached from the front of her dress. The medical examiner concluded that the time of death of both victims was around 5:30 a.m. (RE11 at 1241, 1244-45, 1247-48).

After paying his probation fees, Petitioner called home. Ferrell's mother had already gone to the crime scene and a neighbor answered Ferrell's call. (RE43 at 569-72). The neighbor only advised Ferrell that his grandmother was sick and that his mother had gone to his grandmother's house. (Id.) The neighbor purposefully did not tell Ferrell anything else, and specifically did not advise him his grandmother was dead. (RE43 at 569-72, 614). Ferrell explained to his friend that "the mafia had hurt his grandmother because his Uncle Freddie had killed a guy last weekend," and "he needed to get back home." (RE43 at 581, 615; RE10 at 897-98).

At the site of the fatal shootings, the police discovered three purses, one underneath the bed where Mrs. Lowe normally slept, one on the door, and one on the wooden table beside her bed. The contents of one purse had been emptied onto the bed. (RE11 at 1037-39).

As part of the investigation, Ferrell, along with other family members, were interviewed at the police station. During his initial interview, the police asked Ferrell to empty his pockets and discovered about $676 in cash and a lot of loose change. (RE43 at 638). During subsequent interviews, Ferrell was unable to account for the $676 in cash. Contrary to what he had told his friend, he told the police that he had saved some of the money and had recently been paid for a construction job. (RE10 at 981-84; RE11 at 1046-47). But the detectives soon learned that Ferrell usually had little or no money. (RE43 at 640). Also, contrary to his claim that nothing was missing from Mrs. Lowe's home, the police discovered that a substantial amount of money was missing. According to family members, Mrs. Lowe received Social Security benefits and approximately $50 a day in change[2] from selling drinks, candy, and snacks in the neighborhood. (RE43 at 568, 631). She kept all of her money in her house. Further, Mrs. Lowe's daughter, Annie Fallen, had taken her mother to the hospital earlier in the year and Mrs. Lowe had about $700 in cash at the time. (RE10 at 846-48). Mrs. Lowe hid the money in a powder puff in her bra. (RE10 at 847-48).

Based on the repeated irregularities in statements made by Ferrell during his interviews with the police, the police obtained a search warrant for his mother's

---

[2] On the morning of the murders, Ferrell asked his mother for coin wrappers. (RE43 at 559, 612).

6

home, where he resided. (RE43 at 644). Pursuant to the warrant, the police searched the home and found a .22 caliber revolver later identified as the murder weapon. (RE43 at 644, 654, 657). The police then arrested Ferrell, and discovered four spent rounds of .22 ammunition still in his pocket; the rounds were later determined to have been fired from the murder weapon. (RE43 at 647-48).

During the course of the investigation, Ferrell gave several voluntary statements, was advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), and waived them in writing at least two times. (RE43 at 643, 650). In his first three or four statements to police, he claimed that on the morning of the murders his grandmother had awakened him at 5:30 a.m., and he had left to get ready for work. (RE43 at 635). Ferrell also mentioned that he spent the night with his grandmother because she was afraid to stay alone after having received a series of threatening phone calls.[3] (RE43 at 634). He did not report that anything had happened that morning.

_____

[3] Several witnesses denied that Mrs. Lowe was afraid immediately before her murder. (RE43 at 675, 677 (daughter knew nothing about threatening phone calls); RE42 at 516 (church pastors knew of no threats and said Mrs. Lowe "was not afraid to stay alone and was doing just fine"); RE42 at 517 (Fred Lowe had received several hang-up calls before turning himself in, but no threats, and his mother never reported threatening calls); RE42 at 518-19 (Robert Lowe spoke to his mother twice a day from jail, and had not heard of any threats to his mother or the family, or for that matter that his mother was afraid or had problems with anyone); RE43 at 566, 628 (daughter and mother spoke day before murders and mother did not say she had received threats or threatening calls)).

In his final statement to the police, however, the Petitioner claimed that two men had entered his grandmother's home as he was leaving and demanded to see his uncle, Fred Lowe, who had just been charged with murdering a man named Whimphrey ("Wimp") Hinton. (RE43 at 651).[4] Ferrell said the two men then took his gun from him and shot both Tony Kilgore and Mrs. Lowe in the bedroom where the bodies were found. (RE43 at 651-52). After the shooting, the two men purportedly returned the gun to Ferrell, inexplicably gave him a large sum of cash, and let him live. (RE43 at 652). He also told the officers that he left his grandmother's home through the front door (which was dead bolted when police arrived) and went home. (RE43 at 652). Ferrell then put his gun away, checked to see how much money the men had given him, and made himself hot chocolate. (RE43 at 652-53).[5]

Ferrell was tried for the murders in the Superior Court of DeKalb County, Georgia. Ferrell was the only witness called to testify for the defense. Again, he claimed that two men had committed the killings in revenge for his uncles' killing of Wimp Hinton (RE11 at 1321), and that they left him with the gun and money. However, Tony Hinton, the son of murder victim Hinton, was allowed, over

_____

[4] By the time Ferrell gave this statement, he had already been arrested, and had signed the second waiver of his <u>Miranda</u> rights. (RE43 at 650).

[5] Subsequently, Petitioner took a polygraph examination about his version of the events and failed. (RE43 at 842-43).

defense counsel's objection, to testify that no one in his family sought revenge for his father's death. Ferrell's uncle, Fred Lowe, assisted the prosecution in obtaining Tony Hinton's testimony. (RE11 at 1162-64).[6]

On September 16, 1988, Ferrell was convicted of two counts of malice murder for the fatal shooting of his 72-year-old grandmother and his young cousin. (RE12 at 1601). He was also convicted of one count of armed robbery and one count of possession of a firearm by a convicted felon. (RE12 at 1601).

## B.    The Penalty Phase of Trial

During the penalty phase, the State presented no evidence. Defense counsel, Larry Schneider, called five witnesses: Ferrell's parents, two of his five brothers, and an uncle -- all of whom testified for a total of 26 minutes, including a break. In their sparse testimony, the witnesses said that they did not believe Ferrell had committed the murders, brother Darrell Walker and both of Ferrell's parents asked the jury for mercy, and brother Stanley Ferrell noted that Ferrell had committed himself to Christ before the murders. (RE13 at 1622-60).

---

[6] Ferrell was represented by the DeKalb County Public Defender's Office. The Public Defender's Office also represented Petitioner's uncles, Fred and Robert Lowe, on charges arising from Wimp Hinton's murder. Ferrell's uncles' charges were pending throughout his indictment and trial. A month after Ferrell's conviction, Fred Lowe pled guilty to involuntary manslaughter and was sentenced to six months in jail and five years' probation for the Hinton killing. (RE18, Ex. 1). Robert Lowe pled guilty to the reduced charge of simple battery and was sentenced to twelve months' probation. (RE18, Ex. 2).

Notably, Ferrell suffered a seizure during the charge conference following the presentation of testimony at the penalty phase, in the presence of the court but out of the presence of the jury. He fell to the floor, "flopping," shaking and crying out unintelligibly. (RE13 at 1643-44). The court recessed while deputies and defense counsel investigator Phyllis Corder remained with Ferrell. Some ten minutes after adjourning, the court observed that "Mr. Ferrell's composure" had returned, and defense counsel announced that Ferrell wished to proceed. (RE13 at 1644).[7] Defense counsel did not seek any continuance or make any motion to have the defendant evaluated by a mental health expert.

During closing argument, the prosecutor stressed the depravity of the crime and Ferrell's odd behavior after the murders. He declared that Ferrell was "the

_____

[7] Defense investigator Corder later described the seizure this way:

> During the penalty phase, Eric had a convulsion or seizure, and fell out. It happened completely out of the blue. He fell onto the floor, shaking and speaking gibberish. Really, it sounded like a foreign language. All I could think was that it sounded like speaking in tongues, perhaps because he had said so many times that Jesus would save him. It lasted about five minutes, and he indicated for a couple of minutes that he could not breathe. The judge cleared the courtroom of everyone except two or three deputies, and me. When it ended, it seemed Eric didn't know what had happened, or that anything had in fact happened.

> There was no question in my mind that this was a genuine seizure -- the jury was not present and Eric was not trying to get some kind of delay. It seemed then that the trial should have been stopped and Eric should have been examined medically or had some sort of evaluation, but it all happened extremely quickly.

(RE41 at 18-19 (Aff. of Phyllis Corder)).

10

Devil made flesh"; Ferrell's behavior demonstrated "depravity of mind"; Ferrell "planned it out"; the crime was "depraved, and evil, and totally corrupt"; it was "a cold-blooded execution" showing depravity and cruelty and a complete lack of remorse; and "after executing his grandmother and his cousin, [Ferrell] walked slowly up the street to his mother's house . . . fixed a cup of hot chocolate . . . plopped down on the couch, watched TV with the remote . . . and dozed off for a while." (RE13 at 1670-96). The prosecutor then asked the jury, "[w]hy in the world, how in the world, could anybody do this? How could a human being act like this?" (RE13 at 1694). The prosecutor assured the jury that he, unlike the defense witnesses, would not insult their verdict. (RE13 at 1683).

Defense counsel then argued to the jury that because they had already found one aggravating circumstance -- that Ferrell had committed the murder of his grandmother during the course of another felony, the murder of his cousin -- they could "legitimately find the death penalty." (RE13 at 1698). Counsel "assum[ed] that it's true that [Ferrell] did do it," (RE13 at 1698), and bemoaned <u>his</u> responsibility for arguing to the jury "that the death of a 72-year-old lady, by execution, and the death of a 15-year-old boy, by execution, are not deserving of the death penalty." (RE13 at 1699). He added that "the only way I can try to convince you" this "enormous" crime was not so bad, was to compare it to other

11

situations counsel had seen at the Public Defender's Office: "young children, babies, who are sexually assaulted, to the point of mutilation and strangled." (RE13 at 1699).

Defense counsel asked the jury whether Ferrell was "completely . . . the animal" the prosecutor had labeled him, and admitted that Ferrell was not necessarily a "person of good character," but questioned whether it was necessary to kill him. (RE13 at 1701-02). Counsel highlighted for the jury that there was no rational reason for Ferrell to have committed the double murder and that it was a case based solely on circumstantial evidence, but noted that all the circumstances pointed toward Ferrell, and that Ferrell's "absurd tale of two gunmen" who committed the double homicide using his pistol, then paid him some money and returned his pistol to him, was "hard to swallow" and "hard to believe." (RE13 at 1704). Counsel assured the jury "I am not ridiculing your decision. No rational jury would have found otherwise in the guilt-innocence phase because of the ludicrousness of that story." (RE13 at 1705). Counsel then closed by asking the jury for mercy.[8]

---

[8] Defense counsel's entire argument went like this:

Ladies and gentlemen, I guess you can tell from Mr. McDaniel's closing argument that he is a good attorney. He's relatively young, and I guess you could say that he's going to be . . . a really good attorney . . . but he already is one. He did a brilliant job.

12

My function at this point is to do the best I can to persuade you not to sentence Eric Ferrell to death.

I'll start with the law. This (indicating) is the charge of the Court on the death-penalty phase. You'll each be given a copy of this to go out with you. This (indicating) is the law you are required to follow in the determination of death or life.

I'll start by stating . . . that the first aggravating circumstance was the ones involving . . . commission of a crime during . . . a capital felony -- murder during another capital felony -- are in the case; there's no question about it; you've found that. You've met the requisite standard, beyond a reasonable doubt. So you are authorized under the law to sentence him to death.

As far as the other two aggravating circumstances, the ones . . . which you will see from the charge . . . both require torture. Our contention is: Those are not in the case. That Mr. McDaniel's theory of how things happened is a theory that is supported by the evidence, but there are any number of other theories that would rule out torture. The Judge will charge you that you would not be authorized to find that the offense of murder involved torture simply because the victim suffered pain or briefly anticipated the prospect of death.

That's not important. That's not important, because it's not necessary to find two or three or aggravating circumstances to give the death penalty. You only need to find one. And that unquestionably is here, so you can legitimately find the death penalty, under the circumstances of this case, because you have two murders and you have murder in the commission of an armed robbery.

Mr. McDaniel described, in graphic terms, what this lady suffered under his theory of the case before she died. But we don't know what happened in that room that night. Don't know.

Dr. Burton testified that the scenario, as spelled out by the District Attorney's Office, met the facts but there are other scenarios that meet the facts. We don't know why this crime was committed.

You have found that Eric Ferrell did it. I'm assuming that it's true that he did do it. We don't know why. We don't know what happened, we don't know the specifics. All we have are the bits of physical evidence and Mr. Ferrell's denial.

And I have the unpleasant duty at this point of arguing to you that the death of a 72-year-old lady, by execution, and the death of a l5-year-old boy, by execution, are not deserving of the death penalty. Those are enormous crimes, they're very

13

serious crimes.

And the only way that I can try to convince you that the death penalty is not justified is by pointing to other crimes, to worse crimes. You read the newspapers, you see the television sets. This is not the worst of murders. In the Public Defender's Office we handle some 3,000, 4,000 felony cases a year and we see a lot of nasty things. We see young children, babies, who are sexually assaulted, to the point of mutilation and strangled; we see babies . . . .

There are worse crimes. The Alday family murders. We've been reading about that one for a long time. That's worse. Every week, in the Atlanta newspapers, you see something worse. Where people undergo prolonged pain, prolonged torture . . . prolonged anticipation of death.

But this is a bad one, no question about it. Because of the nature of the folks that were killed. There is no impeaching their quality as people. They're good folks, and they were snuffed out. Quickly, we maintain. And painlessly. And possibly -- certainly on the case of Tony -- possibly . . . on Eric's grandmother . . . possibly without knowing what hit them or knowing much of what hit them. But, it's difficult, and it's rough; there's no question about it.

Now, we've heard from Mr. Richter and Mr. McDaniel a lot of characterizations of Eric. He's been characterized as an animal, as a monster, as the Devil . . . as a vulture . . . . I ask you to set aside the pep-rally atmosphere and look at the evidence of what you've heard. Is he completely . . . the animal? Is he one of these folks that has to be snuffed out for the protection of society? Or for the enormity of what he did?

He's not one of these folks, obviously, who has, since he was a little kid, been terrorizing and tormenting people around him. He was never in trouble when he was growing up. He's never committed a crime of violence before. The only offense on his record is a forgery. -- for stealing some money. He's not a mad-dog killer. He has people who care about him; his family cares about him.

I'm not maintaining he's a person of good character, that he's a sterling character, that I'd like to have him move in next door to me -- I wouldn't. But, is it necessary to kill him? -- because of what he is.

Why would he do this thing? There's been argument. The State uses the senselessness of the crime to increase the enormity of the crime. Mr. Sheffield, in attempting to convince you that he did not do it, used the senselessness of the crime as one of the circumstances in the case, to show that he did not do it.

14

Why would someone like this, why would . . . Mr. Ferrell here, who, to all accounts, loved these folks that he murdered . . . who is not a mad-dog killer, had never done this sort of thing before -- why would he do this? Well, we don't know. We may never know.

Mr. Ferrell, if he did the crime, isn't going to tell us, because he has, from the beginning, denied the crime . . . denies the crime now . . . will continue to deny the crime until the day he dies, whether that's in the Georgia electric chair . . . or somewhere else. We can't know, to a certainty, what happened.

Now, all of you were selected for this jury because you believe the death penalty is appropriate . . . . If you were opposed to the death penalty, you would not be here. You would have excused by the Court. If you were one these folks who believes any killing deserves the death penalty, you have been excused the Court. You all have expressed some questions about the death penalty.

I submit to you that the most valid argument against imposing the death penalty is its finality. Cases appear in the paper, they have appeared in our office . . . where people . . . who were found guilty, by juries . . . have later been found -- against all reason -- to be innocent. Nothing is perfect. And the criminal justice system is far from perfect.

. . . .

We're trying this case in a vacuum . . . and there's no other murder case that's ever existed, there is no outside world. If that's all there was, then this obviously is the worst case there is, and it's the case that has the most compelling and final proof.

This is a circumstantial-evidence case; we have a web of circumstances, all of which point toward Mr. Ferrell. And one of the most telling circumstances is this absurd tale of the two gunmen. -- who committed these murders, gave him his pistol back -- using his pistol, they committed the murders -- and then paid him, gave him some money. That is hard to swallow. That is hard to believe. But that is Mr. Ferrell's story, that is what he has stuck to from the beginning.

Now, can you say, to an absolute certainty, to a life-or-death certainty . . . not a prison-sentence certainty but a killing certainty . . . that that story is untrue? It is a wild story. But as we all know from our daily lives, strange and peculiar and wild things do happen; and can you be sure . . . can you be sure . . . that that story is false and that Mr. Ferrell . . . committed these murders? Are you sure enough to impose the death penalty? That's the core question; that's what Mr. McDaniel wants to keep you from thinking about.

Not surprisingly, the jury returned two death sentences on September 17, 1988. (RE13 at 1737). The jury found three statutory aggravating circumstances: first, the murders were committed while the offender was engaged in the commission of the offense of murder, Ga. Code Ann. § 17-10-30(b)(2); then, the

---

I am not ridiculing your decision. No rational jury would have found otherwise in the guilt-innocence phase because of the ludicrousness of that story. You could try this case a thousand times before a thousand juries and you'd get the same result; we've all known that from day one. But can you be sure?

Mr. McDaniel is a brilliant orator; he has painted this case . . . in extreme terms. I ask you to consider in the jury room the three points that I've raised. Is this the worst of murder cases? Is this a death-penalty murder case? Talk about it. Talk about cases you've read about. Is this that bad? This is not a self-defense case. It is not a heat of-anger case. Those aren't murder cases.

Think about that. Secondly, is this (indicating) an animal? Is he without hope? Is he such a beast that he needs to be put to sleep, be killed.

That's the second point I'd ask you to consider; and the third . . . : Are you absolutely sure?

And after you've considered those four points that I'd contend are raised in the evidence, I'd ask you to just consider one more, and that's being merciful. It's true . . . that Mr. Ferrell on that night . . . assuming . . . that he did this thing . . showed no mercy to his victims; does that preclude you as jurors from showing it?

The law is -- and it's here (indicating) in the charge . . . that even beyond all these legal principles . . . contained in the charge . . . you may fix the penalty at life imprisonment, if you see fit to do so, for any reason satisfactory to you, or without any reason. And even if you find against Eric Ferrell on all these things . . . I want to ask you . . . the same thing that . . . Eric's close family members asked you here this morning, to show mercy.

Thank you.

(RE13 at 1696-1706).

murders were committed while the offender was engaged in the commission of the offense of armed robbery, Ga. Code Ann. § 17-10-30(b)(2); and, finally, the murder of Ferrell's grandmother was outrageously and wantonly vile, horrible or inhuman in that it involved torture and depravity of mind, Ga. Code Ann. § 17-10-30(b)(7). The trial court sentenced the Petitioner to death for the two counts of murder, life imprisonment for the armed robbery count, and five years' imprisonment for the firearm possession count. (RE13 at 1741-42).

Following his conviction and sentence, Ferrell was placed on suicide watch in prison, from at least April 14, 1989 until February 23, 1990. (RE1 at 178).

## C.    The Motion for New Trial

At a subsequent evidentiary hearing conducted on defendant's motion for a new trial, several witnesses testified about Ferrell's claims that he suffered from conflict-riddled counsel, that his counsel was ineffective at the penalty phase, and that Ferrell was constructively absent from critical portions of his trial. The testimony was, on the whole, clumsy and profoundly incomplete.

First, Catherine Shaw, the mother of Ferrell's two children, testified after being subpoenaed by defense counsel. Shaw had not been called to testify during the penalty phase, but later said that if she had, she would have told the jury that Ferrell tried his best to take care of his kids. (RE17 at 15). But, in response to a

17

question posed by defense counsel about whether she would have asked the jury at trial to spare Ferrell's life, Shaw answered that she could not say. (RE17 at 22-23). Alice Stewart, Ferrell's counsel during the motion for new trial and on direct appeal, testified later that "[h]ad I known she would give such damning testimony, I would not have called her as a witness." (RE41 at 11).

Hubert Bailey, Ferrell's uncle, recounted at the evidentiary hearing that he had spoken to trial counsel for the first time in the courtroom hallway before testifying at trial, but counsel had not mentioned what Bailey should or should not talk about. (RE17 at 63-64). Bailey could have testified at trial that he had given advice to Ferrell "about life," Ferrell was not a rough guy, Ferrell wanted to make a happy home for his sons, and there had been a fire at the Ferrell home that forced the family to lean on Ferrell's grandmother. (RE17 at 62-76). Another of Ferrell's uncles, Robert Lowe, who had been in jail for Wimp Hinton's murder, said that he was never asked to testify at Ferrell's trial. (RE17 at 95). Ferrell's father, Wilbert, added that he would have testified at the penalty phase, if asked, that Ferrell's death would have made his family, especially his mother, suffer. (RE18 at 262).

Ferrell's brother, Stanley, recalled how their mother had suffered from "nerves," and once had a "nervous breakdown" from the stress of financial hardship and caring for six boys. (RE17 at 99, 107-08). Stanley further testified

18

that their father was not around much when they were growing up, that the family was very poor and experienced financial difficulties because their father "missed appropriate" [sic] funds, even though he was working all the time, and that the family was forced to move around a lot because they were frequently evicted from their homes, which was upsetting, frustrating, and caused the children great shame. (RE17 at 97-98, 101). Stanley also described how a fire consumed one of their homes, resulting in splitting up the children afterwards. (RE17 at 100).

Mike Sheffield, one of Ferrell's two trial counsel, who led the guilt phase of trial, testified at the hearing as well. Sheffield said that in preparing for trial, counsel had requested a report on Ferrell's mental capacity by a mental health expert, Dr. Ralph Allsopp. (RE17 at 44, 154). In addition, Ferrell had given trial counsel a list of character witnesses; and counsel had reviewed his school and criminal records. (RE17 at 149). Defense counsel determined that they did not want to call Ferrell's jailed uncles as witnesses because neither jailed uncle could say anything favorable about Ferrell (since they both thought that Ferrell had killed their mother), and in any event, had been in jail at the time of the murders. (RE17 at 130, 138; RE18 at 202). Counsel did not want the State to call the uncles either. (RE18 at 203, 205).

As for the seizure Ferrell suffered in court during the charge conference, Sheffield recalled that the investigator Corder, who had developed a good relationship with Ferrell, had said that Ferrell wanted to continue with the trial and was alright. (RE18 at 178). Remarkably, defense counsel saw no need or basis to seek a continuance so that the defendant could be evaluated or a mistrial. (RE18 at 178-79).

Larry Schneider, Ferrell's other trial counsel, who led the penalty phase, also described the trial preparation. Schneider said that before trial, Ferrell prepared a list of 40-45 mitigation witnesses, and investigator Corder and her team interviewed those who would talk and could be located. (RE18 at 212, 226).

Schneider recounted that he had discussed the case with a few experienced death penalty lawyers, and because they could find no other reason for the jury not to impose death, decided the best approach was residual doubt. (RE18 at 213, 228). Schneider viewed his strategy as arguing to the jurors that they could not be so sure of guilt as to impose the death penalty, that there was always a possibility of innocence, and that the victims had not been tortured. (RE18 at 220).

Schneider talked to each of the mitigation witnesses following the guilt phase, and told them they could say anything they wanted to concerning whether Ferrell should receive the death penalty. (RE18 at 214, 215, 228). Schneider

thought it would be more effective just to have people speak, rather than to instruct them in any way. (RE18 at 216). Schneider spoke to Ferrell's parents throughout the case, and the investigator talked to the rest of Ferrell's relatives. (RE18 at 220).

According to Schneider, the mental health evaluation they had requested was limited to whether Ferrell was retarded and whether he suffered from any problems that would affect the waivers of <u>Miranda</u> rights he had signed for the police. (RE18 at 216-17). Schneider claimed that he had no reason to raise a psychiatric defense, and did not want to give the jury concrete evidence that Ferrell was rational and intelligent. (RE18 at 231). Schneider also claimed that after the courtroom seizure during the charging conference, Ferrell seemed "very much in contact with reality." (RE18 at 234).

The limited pre-trial psychological report from Dr. Allsopp was made a part of the record. In the report, Dr. Allsopp noted that he had met with Ferrell <u>only</u> "for the purpose of reviewing his academic records and administering intelligence/ cognitive and achievement tests." (RE1 at 151). Dr. Allsopp reported that Ferrell "achieved a Full-Scale WAIS-R IQ of 87, in the Low Average Range of Intellectual functioning, with a Verbal IQ of 81 and a Performance IQ of 101." (<u>Id.</u>). Dr. Allsopp also observed that "Ferrell was able to copy geometric designs

of progressive complexity at level consistent with that of adults who do not display gross neurological/organic deficits." (RE1 at 152). Dr. Allsopp concluded that Ferrell "functions in the Low Average to Average IQ Range," his intelligence level and mental status at the time of assessment "would not adversely affect his ability to understand his constitutional rights," and "there was no indication that Mr. Ferrell would be more likely than the average person to submit to the authority of police officers." (RE1 at 152).

After conducting a hearing on the motion for new trial, the state trial court denied the motion in full. In so doing, it rejected Ferrell's claim of a conflict of interest based on the Office of Public Defender's representation of both Petitioner and his uncles, Ferrell's claim of ineffective assistance of trial counsel at the penalty phase, and Ferrell's constructive absence claim, based on his argument that he had been unconstitutionally absent from trial when he suffered a seizure. (RE1 at 261-65).

## D.    The Direct Appeal

On direct appeal, the Georgia Supreme Court concluded that trial counsel had been effective and affirmed Ferrell's convictions and sentences on March 15, 1991. Ferrell v. State, 261 Ga. 115 (1991). The Georgia Supreme Court found that: (1) Ferrell was represented by two experienced public defenders; (2) counsel

22

filed numerous pre-trial motions, investigated the case legally and factually, conducted an extensive voir dire examination of prospective jurors, cross-examined state's witnesses, presented defense witnesses, and delivered substantial closing arguments; and (3) counsel interviewed numerous potential witnesses in mitigation, many of whom had been furnished by the defendant, and of the very few who would say anything favorable on the defendant's behalf, these testified at the trial. Based on these findings, the Georgia Supreme Court concluded that Ferrell had failed to establish either deficient attorney performance, or a reasonable probability that the testimony of the new witnesses would have caused the sentencer to conclude that the balance of aggravating and mitigating circumstances did not warrant death. Ferrell, 261 Ga. at 119-20 (citations and quotation marks omitted). As for the conflict-of-interest claim, the state high court observed that "[t]here was no relationship between the two separate cases of murder, and the defendant's uncles did not testify at, and had no information relevant to, this trial." Id. at 120. Accordingly, it concluded that "[t]here was no actual conflict of interest adversely affecting trial counsel's performance in this case." Id.

On October 21, 1991, the United States Supreme Court denied Petitioner's

petition for writ of certiorari. Ferrell v. Georgia, 502 U.S. 927 (1991), reh'g

denied, 502 U.S. 1051 (1992).

## E.    State Habeas Proceedings

On July 19, 1995, Ferrell filed a petition for writ of habeas corpus with the

state trial court, which held an evidentiary hearing on the petition on July 13, 1999.

At the hearing, the State called as a witness Alice Stewart.[9] For the defense, Ferrell

submitted a voluminous number of affidavits that described in great detail Ferrell's

many mental health issues, his impoverished and abused childhood, that he was

slow as a child, and that he always had a strong work ethic.

As for the first and most critical point, the mental health expert who

examined Ferrell before trial, Dr. Allsopp, averred that he had not been asked to

look for brain damage, that he was provided with no material from counsel other

than school records, and that he was not asked to perform any clinical interview, or

do anything else for that matter, for use in mitigation. (RE41 at 265).

Ferrell also submitted very extensive affidavits from three mental health

professionals who opined that Ferrell suffers from organic brain damage, mental

---

[9] The only other live testimony at the hearing was also introduced by the State -- Lucia Fletcher, the deputy warden of care and treatment at Ferrell's prison, who testified about one of Ferrell's previous IQ tests. (RE40 at 67).

illness, an epileptic or seizure disorder, and borderline mental retardation. Specifically, Dr. Thomas Hyde, a board-certified neurologist, and Dr. Barry Crown, a board-certified clinical neuropsychologist, unambiguously averred that Ferrell suffers from organic brain damage to the frontal lobes, temporal lobe epilepsy, and bipolar disorder, is borderline mentally retarded, and attempted suicide twice, once at the age of eleven. Dr. Hyde explained that individuals with frontal lobe dysfunction display impaired insight and learning abilities, are more prone to impulsive and explosive behaviors, and are more prone towards affective instability, meaning a dysfunctional emotional or mental state. (RE41 at 43-44). Hyde further opined that Ferrell's frontal lobe dysfunction "to a reasonable degree of scientific or medical certainty, is attributable to closed head injury or neurodevelopmental factors, and existed prior to 1988." (RE41 at 43).

Dr. Crown offered that when Ferrell "finds himself in a complex, stressful set of circumstances, [he] cannot process the information to take the appropriate action." (RE41 at 75). Crown said that Ferrell has "significant impairments in judgment and mental flexibility, which are indicative of brain damage," (RE41 at 75), "profound problems in using sound reasoning and judgment under stressful conditions," (RE41 at 76), and "significant problems with simple concentration, attention and mental flexibility" resulting in "increased impulsivity and decreased

25

ability to plan and to understand the consequences of one's actions," (RE41 at 77-78).  Moreover, he explained, the actions of an individual with Ferrell's types of impairment "are not entirely volitional," (RE41 at 81), because "[d]uring a complex partial seizure a person is overtaken by a powerful emotion, usually anger or fear, by hallucinatory voices or visions, or by a vivid flashback," and "[s]eizures also alter the behavior which takes place between or after the seizures, or interictally, resulting in lack of awareness, dullness, and confusion as neurofibers in the brain readjust.  Interictal effects may go on for weeks or months at a time." (RE41 at 55).

Dr. Hyde described Ferrell's seizures or "episodes" and their frequency this way:

These episodes occur on a daily basis about once a day. Nothing in particular induces them. They come on without warning. He cannot talk during these episodes, but can be aroused by the external stimuli of others.  He appears to others to be in a daze during these episodes.  After these episodes he feels tired, disoriented and often tearful and discouraged.  He describes these episodes as being "blanking out." He will stop any ongoing activity, such as writing a letter during these episodes.  He has never fainted or passed out with these episodes.  There is no associated nausea or vomiting.  These episodes usually last 5 to 10 minutes.  Sometimes he is in and out of these spells all day long.  The last such episode occurred on the day of this examination. They occur more frequently with sleep deprivation, extreme depression, situational stressors or high levels of anxiety.  He has never had an EEG.  He has never had a neurological evaluation for these episodes.  They are often followed by a left frontotemporal headache.

(RE41 at 36).

Neurologist Hyde then explained Ferrell's "psychotic symptomology" in these terms:

> [Petitioner] has had intermittent depression since childhood. His depressive episodes last anywhere from one day to several months. During these episodes he feels unhappy, tired and pathetic. He is frequently socially withdrawn and does not enjoy anything . . . Eric has a significant history of suicidal ideation. He last had suicidal thoughts two weeks prior to this evaluation. However, he does not want to kill himself. Rather he wants God to passively "take him." He has attempted suicide twice in his life. At 11 years of age, he attempted suicide when his mother was depressed and hospitalized following a suicide attempt of her own. . . . He attributes "supernatural happenings" to his survival. . . . He has never been treated for depression.
>
> . . . [H]e has [also had] episodes consistent with mania since childhood. . . .
>
> Obsessive-compulsive symptomalogy has also been an issue. He is obsessed with "God and his words". He states that he has "seen the light." He has seen blood streaming down from heaven, churches, and the bride of Christ. His religious visions started in childhood. They became understandable to him in 1989. These have occurred once or twice a month. He also hears a small, still voice during these visions. They do not scare him. He also has the power to heal from laying his hands on others for the past nine years.
>
> . . . .
>
> He developed auditory hallucinations at 10 years of age. These have occurred on an infrequent basis and have not occurred in the past two years. He has heard multiple male voices, telling him to read his Bible and pray. He believes these voices are the voice of God. These

27

voices have never told him to do bad things. They have never told him to hurt himself or to hurt others. They have never threatened him. They have told him to watch out for others who wanted to harm him. He usually hears these voices when he is manic. He also saw angels, a form of visual hallucinations, transiently 5 to 10 times in his life. He last saw them one month ago. Frequently his visual hallucinations occur when he is manic. He also has visual hallucinations as described when discussing his hyper-religiosity. He denies any olfactory, gustatory or tactile hallucinations. He worries that demons can possess people's minds. He, himself, has not been a victim of demonic possession. He denies any ideas of reference. He denies any paranoid or somatic delusions. He denies any delusional guilt. He has a grandiose belief that he has "Been called by God to be a minister" since childhood.

(RE41 at 31-34, 44). Dr. Crown also observed Ferrell's unusual religiosity. (RE41 at 68).

According to forensic psychologist Jethro Toomer, Ferrell scored a 74 on the WAIS-III IQ test, with a performance IQ of 70 and a verbal IQ of 79, and Toomer concluded that "[w]ith the existence of significant deficits in adaptive functioning, Mr. Ferrell's score on the WAIS-III is within the range of mental retardation" -- meaning that it is below 70-75. (RE41 at 85). Toomer also concluded, like the other experts, that Ferrell's performance suggested organic brain damage. (RE41 at 85-86).

Ferrell's family and friends also would have told the jury, if asked, about the mental health problems suffered by Ferrell's mother, Ruby. According to friends and family, she was depressed and had attempted suicide, and was "scary" to the

28

boys.  (RE41 at 138-39 (Aff. of Stanley Ferrell); see also RE41 at 233 (Aff. of

Wilbert Ferrell Jr.); RE41 at 242-43 (Aff. of Jimmy Freeman)).  Indeed, records of

Ruby's treatment at the psychiatric ward of Grady Hospital revealed that she

suffered from severe headaches, and felt unhappy, aggressive, and slept and ate

poorly.  (RE54 (Grady Records 2/20/75)).  According to the records, she too, like

Eric Ferrell, heard voices, had visions, and experienced "rage blackouts," where

she did not know what she was doing.  (Id.; RE41 at 124 (Aff. of Ruby Ferrell)).

She also reported urges to harm her husband and her children, which she felt

"unable to control."  (RE54 (Grady Records 3/10/75)).  Ferrell's mother

"admit[ted] to all four hallucinations . . . [--] auditory, visual, tactile, olfactory

[and] to having thought about killing self, kids, and husband on a few occasions."

(Id.)  She complained of her mind snapping and of hearing voices telling her to hit

her children.  She quit her job because of fears of harming her employer's child.

(Id.) She experienced "fugue-like states." (Id.) She was medicated with Valium,

and given a provisional diagnosis of schizophrenia.  (Id.)

    A neighbor also offered that Ruby's mental problems run in her family: "It's

hard to put into words exactly, but there are more than a couple of folks in her

family whose elevators don't go all the way to the top floor."  (RE41 at 242-43

(Aff. of Jimmy Freeman).  Ruby Ferrell's hospital records were consistent,

recording that the family history "reveals depression in the female siblings and sociopathy in the males -- this is classic pattern for the depressive type that is endogenous (inherited)." (RE54 (Grady Records 8/28/76)).

Ferrell's work habits also revealed elements of bipolar disorder. His brother Wilbert, Jr. noted that Ferrell would go on streaks where he did nothing but work: "At times, he would get in moods where he'd stay working all day and into the night." (RE41 at 234 (Aff. of Wilbert Ferrell, Jr.)). Ferrell's father noted the same thing: "That boy would go through times when he'd work like a maniac." (RE41 at 158). An employer noted other symptoms of Petitioner's bipolar disorder:

> He had some funny ways. He talked a lot, chattered, really, but he moved fast too, working. He'd do what you told him to do. He had a way of looking sometimes, like something was loose there, then he'd snap back to you.

(RE41 at 191 (Aff. of William Kilgore)). Schoolmate Cynthia Ivey recalled Petitioner "blabbering" and running "his mouth in overdrive," alternated with quiet periods. (RE41 at 194). And a neighbor described his "spells," where "he'd just stare off for a few seconds or so." (RE41 at 205 (Aff. of Elaine Guthrie)).

Ruby, Petitioner's mother, also explained that just like her, Eric Ferrell had seen his dead grandmother's spirit in their house while growing up. (RE41 at 122-23). And she and her husband described how Ferrell was always going to the emergency room when he was little because he was always falling down or getting

30

hurt.  Notably, they relayed how Ferrell had been hit in the head with a 2x4 and kept "falling out," twice was knocked unconscious while playing ball, and had headaches after a car accident.  (RE41 at 123-24; see also RE41 at 159 (Aff. of Wilbert Ferrell, Sr.)).

In addition to presenting testimony from family and friends, habeas counsel offered testimony from defense counsel's investigator, Phyllis Corder, who provided her impressions of Ferrell's mental health:

> Looking back, I'm sure we didn't do an adequate job of investigating th[e mental retardation] issue.
>
> Certainly in Eric's case, there was evidence that he had some kind of mental disorder. Eric was extremely religious, obsessively so. He said God had told him not to worry, and he was confident there would be a second coming and God would deliver him from being convicted and sentenced to death. This preoccupation with religion adversely effected his demeanor at trial.  He laughed and smiled inappropriately throughout the proceedings.  For me, it really brought into question his mental state, and I believe it was a signal that something was wrong other than mental retardation. I kept wondering about it long after the trial was over.

(RE41 at 18).

Similarly, Ferrell's first trial counsel, August Siemon, who met with Petitioner several times, explained that he too harbored serious questions about Ferrell's mental health:

> I felt Eric Ferrell had mental health problems which were overt and fairly apparent to anyone who cared to look closely. In speaking with

31

Eric, his eyes would glance away for several seconds and then suddenly seem to come back to you. It was not shifting eyes from nervousness -- his face would go blank, and then would become animated once again. He didn't seem particularly worried about what was happening -- his affect was wrong, given the circumstances. In my experience, this is characteristic of people who are relatively low-functioning, intellectually, for whatever reason. He talked about his religious beliefs a lot also, in a very fundamentalist way. He seemed to think God would take care of him regardless of what happened at trial, and he talked about how God spoke to him. Additionally, the facts of the case were so incredible you had to question Eric's mental functioning. Whether his story was true, or if he were the killer, why would he carry the bullet casings around in his pocket the entire day until he reached the police station? It seemed clear to me that . . . a mental health defense at guilt/innocence and penalty phase was the best avenue of investigation, and hiring a neuropsychologist would have been my first priority.

(RE41 at 153-54) (emphasis added).

Despite this wealth of background information, investigator Corder admitted that in preparation for trial, she had only asked statutory character evidence questions of the potential witnesses, and only followed up with them if they said anything positive about Ferrell. (RE41 at 17-18; RE42 at 498-515, 525-527). The "character" worksheets listing the questions used to interview potential witnesses contained six questions: (1) How long have you known of the Defendant?; (2) Are you familiar with his reputation for character in the community in which he lives or works?; (3) What is that reputation; good or bad?; (4) Have you ever heard anyone speak ill of the Defendant?; (5) Would you believe the Defendant if he were to

32

testify under oath?; and (6) If you knew he had been charged with the crime for which he is on trial but no verdict had been returned, would your opinion change? (E.g., RE42 at 498-515, 525-29). The first five questions were taken from the statute governing character evidence in Georgia, see O.C.G.A. § 24-9-84, and the final question simply anticipates cross-examination. See Mathis v. State, 333 S.E.2d 10 (Ga. Ct. App. 1985). Generally these were the only questions asked of the potential witnesses. (RE41 at 17).[10]

Ferrell also submitted affidavits from those who would have testified at length, if asked, about his substantially abused and impoverished upbringing. Ferrell's brother Darrell Walker detailed the problems he and his brothers faced:

> [Ferrell's father] Wilbert had a very bad gambling problem. He was almost never home because he was out losing money. Everybody knew it, and it made us stand out in the neighborhood. In an area where many people were poor, we were even worse off than others. Every time you turned around, we were getting thrown out because he had lost the rent money. He even borrowed money from us boys to gamble and never paid it back.
>
> . . .
>
> Wilbert's punishments were so abusive he'd be arrested for it now. We lived in terror of Wilbert. Often, Wilbert would come in in the

---

[10] The district court noted in its opinion that "the investigators did not limit themselves to asking questions about the Petitioner's reputation for veracity," (D41 at 16 n.3), and this observation is true -- a review of the record reveals that the investigators did ask the other questions listed above, and where applicable, asked about the witnesses' knowledge of the crime. (RE42 at 496-532). But again, these statutory character evidence questions were generally the only questions asked.

middle of the night and wake us up to beat us. This happened so much that we learned to put on extra pants to sleep in. Sometimes, though, Wilbert would make us strip naked before he'd beat us, and those were the worst. Eric bore the brunt of Wilbert's anger for some reason. I think it was because Eric was always a bit different from the rest of us. . . . Eric, though, no matter how hard he tried, couldn't seem to live life as well as the rest of us. He had a harder time learning things than we did, and he didn't catch on as well.

(RE41 at 168-69). Additionally, brother Scott Walker described Wilbert's drinking and gambling, and how Wilbert liked to beat Scott and Eric Ferrell more than the other boys, (RE41 at 173 (Aff. of Scott Walker)); brother Wilbert, Jr. described how Wilbert, Sr. would wake the boys up to beat them, often for unexplained reasons (RE41 at 233-34 (Aff. of Wilbert Ferrell Jr.)); neighbor Catherine Edwards described how Wilbert's gambling left the family without money for food or rent, and led to frequent evictions (RE41 at 149-50 (Aff. of Catherine Edwards)); neighbor Jimmy Freeman described how Wilbert's bad gambling problem caused the family's evictions (RE41 at 242 (Aff. of Jimmy Freeman)); and neighbor Johnny Shepherd described how Wilbert's gambling left the family dirt poor and the boys hungry (RE41 at 250-51 (Aff. of Johnny Shepherd)).

Ferrell's brother Stanley confirmed that "Eric was [our father's] least favorite," and "received the brunt of our father's beatings," which "happened quite frequently, weekly at least." (RE41 at 136). "Eric . . . tried so hard to please our

father and still never received any love from him." (RE41 at 137-38). His mother echoed that Ferrell's father never wanted anything to do with Ferrell, would regularly reject him, and directed his considerable rage at Ferrell. (RE41 at 126, 128). Even Wilbert Ferrell, Sr. himself explained that "I used switches and my belt to whip [the boys], because kids need whipping and to be chastised strongly." (RE41 at 158).

Stanley described the family home as "an old wooden house with a tin roof. There was no indoor plumbing -- we had an outhouse and a couple of slop jars for nighttime. There were exposed wires all through the house, and just a wood stove for heat. We six boys all shared one room." (RE41 at 132). The house was burned to the ground while the boys were home alone when Stanley was six years old, and the Petitioner was only five. Stanley described the fire as "devastating," and said that the brothers were "very, very badly shaken by this experience," which has had "long . . . after-effects" on the family. (RE41 at 132-33).

Besides describing the violent and chaotic poverty he grew up in, family and friends could have given the jury a picture of Ferrell as an individual. Numerous friends would have testified if asked about his sweet and slow nature as a child:

> [Ferrell] was a nice boy, real mannerly. He was slow to catch on to things a lot; you had to tell him over and over how to do something . . . . Even so, he never got mad or anything like that[.]

35

(RE41 at 183 (Aff. of Annie Mae Dudley)).[11]  His mother also mentioned that Ferrell always had a rough time in school.  (RE41 at 125).  And a custodian at Ferrell's elementary school said that Ferrell "was much slower than the other kids . . . Like, if I told [him] to go get a chair, he would stare at me for a while until the instruction 'clicked' in his head."  (RE41 at 224 (Aff. of Robert Sanders)).[12]

---

[11] Others echoed these sentiments.  Petitioner's cousin remembered him as "a quiet, well-behaved, and mannerly little boy. He seemed a bit young for his age, and . . . he tended to play with the younger kids . . . ." (RE41 at 196 (Aff. of Catherine Sheets Bethea)). Another cousin recalled that "he was a sweet, slow kid." (RE41 at 221 (Aff. of Ann Walker)).  Teacher Betty Cardwell relayed that in seventh grade, Ferrell was a "super nice kid who never gave me any trouble[, and who] was always slower than the other students."  (RE41 at 228).  Teacher Ann Jones similarly reported that Ferrell was "a smiling, happy child . . . [though he] was functioning somewhat below level academically, especially in reading."  (RE41 at 226).

Catherine Shaw's mother, Mrs. Charles Shaw, spoke highly of Ferrell as well:

We never knew just why [our daughter] wouldn't marry such a fine young man . . . Eric was really good with his children; you could just tell how much he loved them. . . . We were real glad he took an interest in spiritual matters . . . Eric was absolutely sincere in his beliefs and, with a lot of help, could have made a minister. . . . The grace of God came easily to him but not the reading and the studying.

(RE41 at 200-02) (Aff. of Mrs. Charles Shaw)).

[12] Habeas counsel also presented evidence that Ferrell was always a "hard worker," and "was willing to work hard if you showed him exactly what to do." (RE41 at 213-14 (Aff. of Robert Lowe); RE41 at 125 (Aff. of Ruby Ferrell); RE41 at 158 (Aff. of Wilbert Ferrell Sr.)). As Ferrell's brother, Stanley, explained, "[d]espite his difficulties, one of Eric's best qualities was that he was a great worker.  He began working when he was real small, doing neighborhood jobs, trying to help out the family.  He was always working and had a lot of pride in doing his best to do a job right, even when he had to work harder than others to do that."  (RE41 at 140). An employer also described Ferrell as "a good worker, and faithful."  (RE41 at 191 (Aff. of William Kilgore)).  Another person explained that although Ferrell "had a hard time learning things easily[,] . . . eventually, after doing it enough, Eric would mostly get the hang of things. . . . One thing for sure, Eric didn't have a lazy bone in his body . . . ."  (RE41 at 200 (Aff. of Mrs. Charles Shaw)).

36

Both the State and defense counsel also submitted evidence concerning Ferrell's counsel, Alice Stewart, who represented Ferrell during the motion for a new trial and on appeal.[13]  Stewart was appointed when the Public Defender's Office withdrew after Ferrell's conviction due to a potential conflict of interest involving Ferrell's uncles.  As we've already noted, Alice Stewart raised an ineffective-assistance-of-trial-counsel claim in the motion for new trial proceedings and on appeal.  She was provided with funding to hire a mental health expert but not an investigator.  (RE1 at 181).

In the oral and written testimony introduced at the state court habeas hearing, Stewart averred that because she was attempting to identify direct appeal issues, worked alone, and had no investigator, she "didn't do the kind of investigation -- it wouldn't have been possible for me to do that that -- the kind of investigation that somebody preparing for trial might do."  (RE40 at 51).  She further said, "I simply could not afford to leave the office and investigate the case

---

[13] On March 10, 2008, the Georgia Supreme Court indefinitely suspended Ms. Stewart from the practice of law for abandonment of clients, and recited her extensive disciplinary history dating back to 1983.  In re Stewart, 658 S.E.2d 573 (Ga. 2008).  The opinion notes, however, that during the time of these incidents, "Stewart may have been laboring under a medical impairment which the State Bar has considered in the past."  Id. at 574.

myself, which is what was necessary to appropriately litigate an ineffective

assistance of counsel claim." (RE41 at 3).[14]

Stewart did, however, hire a psychiatrist (Dr. Sheldon Cohen) to evaluate

Ferrell for competency and sanity, although she provided him only with Dr.

Allsopp's report and the jail records. (RE41 at 9, 91). Most significantly, Stewart

did not tell Cohen anything about Ferrell's visions, anything about his courtroom

seizure during the charge conference, or even about his mother's nervous

breakdown -- even though she was familiar with all of this. (RE41 at 8, 9, 10). Dr.

---

[14] She also admitted that she failed to raise trial counsel's character-only penalty-phase investigation:

> The mitigation investigation performed by the trial attorneys consisted of getting a list of names from Eric, and having investigators speak to them, many by phone. In the trial attorney files, which I had access to, were a number of preprinted forms which asked statutory character witness questions of whether the defendant had a good reputation and whether the witness would believe him. Nowhere in the trial attorney files did I find any evidence that witnesses were asked more than these statutory character witness questions. However, the forms that were in the file did show that the interviews were done asking only the questions found on the preprinted character witness forms, many of the interviews that were done were conducted not in person but by telephone, and the majority were conducted the last week in August or between the two phases of trial. I asked Mr. Schneider about these forms at motion for new trial and he said he received one page typed reports from the investigator on each witness. When I reviewed Mr. Schneider's file before the motion for new trial hearing I found such described reports existed only on names from the state's witness list, some of whom were merely asked the same character questions. I did not introduce those portions of the trial attorney file showing that all of the other witnesses were asked only the statutory character witness questions, instead of the in-depth interviews described by Mr. Schneider. I had no tactical reason for not introducing these reports.

(RE41 at 2) (emphasis added).

Cohen felt the story Ferrell told him -- the same one from trial, that there was a revenge murder, and that Ferrell could not remember the details of the crime -- was concocted to cover up his guilt and that he was lying about not remembering, since Ferrell apparently had not suffered from periods of amnesia before. (RE41 at 9). Dr. Cohen performed no testing of Mr. Ferrell, but nevertheless reported to Ms. Stewart that he appeared competent. (RE41 at 103). Cohen also reported that Mr. Ferrell told him he heard voices, including the voice of the devil inside his head. (RE41 at 91, 103). Stewart did nothing with this information. (RE41 at 9).

Ferrell also submitted at the state court habeas hearing Dr. Cohen's affidavit, which explained that he "felt Eric's report of hearing voices could indicate schizophrenia or other mental disorder, however, I had no background materials indicating there was any history of mental illness." (RE41 at 103). "If I had been given information related to Mr. Ferrell's history of hearing voices and hallucinations, and history of head injuries, I would have referred him for neuropsychological testing and would have attempted to conduct a more extensive . . . evaluation of Mr. Ferrell." (RE41 at 103).

On February 8, 2001, the state habeas court vacated both Ferrell's convictions and death sentence on the grounds of ineffective assistance of appellate counsel in challenging trial counsel's mitigation investigation and penalty-phase

39

presentation, and trial counsel's conflict of interest. (RE59). As for mitigation evidence at the penalty phase, the court concluded that Ferrell's former trial counsel, among other things, presented no testimony regarding Ferrell's background that may have served as proper mitigating evidence, even though there was substantial mitigating evidence that could have been presented through the testimony of the Petitioner's family members -- including facts developed about Petitioner's abusive background, extreme poverty, his mother's mental illness, his own mental illness, his gambling and alcoholic father, and his kind personality, strong work ethic, and other personal characteristics. (RE59 at 8-10). The state habeas court concluded: "had this mitigating evidence been submitted to the jury, at least Petitioner would have stood a more reasonable opportunity to obtain the jury's consideration and mercy." (RE59 at 10). The court further found that appellate counsel, in turn, also had "failed to conduct a reasonably diligent investigation to properly identify and provide supporting evidence of the errors committed at trial." (RE59 at 10).

As for the conflict-of-interest claim, the state habeas trial court determined that automatic reversal was warranted because Ferrell and his uncles had been represented by the same counsel (the Public Defender's Office), albeit for different

40

crimes, and his uncles had refused to be character witnesses for Ferrell because each of them had an interest in protecting their respective plea deals with the State.

On appeal, the Georgia Supreme Court reversed the order of the trial court and reinstated Ferrell's convictions and sentences. Head v. Ferrell, 274 Ga. 399 (2001). In rejecting the ineffective-assistance-of-appellate-counsel claim regarding mitigation, the state high court found that:

> We note, as an initial matter, this Court's own impression during the direct appeal that appellate counsel had "attack[ed] virtually every decision made by trial counsel." [Ferrell, 401 S.E.2d at 746]. Ferrell's appellate lawyer testified in the habeas proceeding that she obtained Ferrell's file from his trial attorneys, interviewed Ferrell, spoke to his family members, reviewed some of his school records, and subpoenaed various other records. She also had an independent mental health expert interview Ferrell, review the findings of the mental health expert employed by trial counsel, and review Ferrell's post-conviction mental health records. At the motion for new trial evidentiary hearing, appellate counsel attempted to show that Ferrell's trial attorneys had not prepared sufficiently for the sentencing phase. Toward that end, appellate counsel presented a number of witnesses, including some of Ferrell's family members, the mother of his children, and his trial counsel. Appellate counsel testified at the habeas hearing that Ferrell's family members were "traumatized" at the time of the motion for new trial. This testimony is confirmed by the testimony of Ferrell's trial attorneys at the motion for new trial hearing indicating that several of Ferrell's own family members believed that he had murdered his grandmother and cousin. Trial counsel further testified that they had been in contact with Ferrell's parents from the beginning of their representation, had obtained a list of 40 to 45 possible witnesses, had used the services of an investigator to assist them in interviewing these witnesses, had obtained school and prison records, had obtained a review of Ferrell by a mental health expert regarding his possible mental retardation and his susceptibility

41

to coercion or confusion during police questioning, and had consulted with several persons who were well versed in death penalty trial strategies in formulating their "residual doubt" strategy for the sentencing phase of Ferrell's trial. As this brief overview indicates, Ferrell's appellate attorney attempted to show the limits of trial counsel's preparation for the sentencing phase, but the evidence actually available, most importantly the evidence of trial counsel's strategic decisions and attempts to develop a theory supportable by available testimony and evidence, was not particularly favorable to Ferrell's claim that his trial attorneys rendered ineffective assistance. Nevertheless, appellate counsel attempted to argue that claim on direct appeal to the extent possible.

Id. at 404-05.

The Georgia Supreme Court also observed that the character evidence trial counsel developed "fit well into trial counsel's chosen sentencing phase strategy of showing 'residual doubt.'" Id. at 405. It then detailed specific mitigating evidence that appellate counsel allegedly had not introduced, and found that some of this evidence -- about his father's gambling, the family's poverty, the frequent evictions, the home fire, his mother's mental issues, and his religious commitment -- was repetitive; some was unhelpful, since it would have shown that the brothers were close, that Ferrell loved his grandmother, who had taken him in after the family fire, and that the murder had "clearly exacerbated" Ferrell's mother's mental difficulties; and some, such as Ferrell's personality as a youth or his father's "discipline," would not have significantly affected the jury. Id. at 406-07.

42

As for appellate counsel's utter failure to develop evidence of Ferrell's organic brain damage, mental retardation, bipolar disorder, and epilepsy, the Georgia Supreme Court said this: "[a]ppellate counsel, like Ferrell's trial attorneys, performed reasonably by obtaining expert assistance in investigating the few issues regarding Ferrell's mental functioning that would have seemed of possible concern to a non-expert and then foregoing arguments not supportable by the opinions of those experts." Id. at 407.

In addressing the conflict-of-interest claim, Georgia's high court first noted that it had found on direct appeal that there was no actual conflict of interest, and that nothing presented on habeas review would have in reasonable probability changed that conclusion. Id. at 408. The court further determined that appellate counsel had not ineffectively presented this claim because she "ably set forth the essential contours of the alleged conflict and supported her claim with documentary evidence showing the nature and timing of the final adjudication in the uncles' cases." Id. Conceding one "arguably significant argument raised by Ferrell in the habeas proceeding that was not raised by appellate counsel," regarding "a new statement, by the uncle [Robert Lowe] who testified at the motion for new trial hearing, that he had not wanted to get involved in Ferrell's case while his own case was still pending," the court found that "this testimony

43

must be viewed in light of the extensive testimony presented at the motion for new trial hearing indicating that the uncles refused to testify for Ferrell, not because of any agreement with the State, but because they believed 'adamantly' that Ferrell had murdered their mother." Id.  The Georgia Supreme Court concluded that "appellate counsel cannot be regarded as having performed deficiently for failing to explore further the testimony of that one uncle at the motion for new trial hearing," and thus that Ferrell's appellate counsel did not render deficient performance regarding the conflict of interest claim.  Id. at 408-09.

As for the constructive-absence claim, the Georgia Supreme Court held that although appellate counsel did not raise any claim concerning Ferrell's constructive absence from trial when he had a seizure in court, she "raised a very similar claim on direct appeal, asserting that Ferrell was denied his right to counsel by his allegedly impaired condition following this episode." Id. at 410.  By raising this similar claim, the court concluded that appellate counsel did not perform unreasonably.  Id.  In any event, the Georgia Supreme Court observed that "the evidence . . . showed that Ferrell regained his composure and appeared to trial counsel to be 'very much in contact with reality' and that the defense investigator had spoken with Ferrell and reported that he was 'all right' and wished to continue . . . ." Id. at 410-11.

44

**F.     Federal District Court Habeas Proceedings**

Having struck out in the state courts, Ferrell commenced this federal habeas corpus action pursuant to 28 U.S.C. § 2254 in the United States District Court for the Northern District of Georgia on October 21, 2002.  He raised fourteen claims, including these: (1) penalty-phase ineffective assistance of counsel because both trial and appellate counsel failed to conduct a thorough investigation (Claim I); (2) ineffective assistance of counsel because of counsel's closing argument (Claim II); (3) ineffective assistance of counsel arising from counsel's conflict of interest (Claim III); (4) ineffective assistance of appellate counsel concerning Ferrell's constructive absence from trial (Claim V(8)); and (5) constructive absence from trial (Claim XIV).  (D1, D12).  The district court denied habeas relief on all fourteen claims.  (D26, D41).

The district court issued a certificate of appealability ("COA") concerning "the denial of [Petitioner's] constitutional right to effective assistance of counsel at the sentencing phase of his trial and because of a potential conflict of interest." (D51 at 1-2).  We granted Ferrell's motion to expand the COA, allowing him to raise two additional claims: Ferrell's "virtual absence from trial" due to seizure, and his appellate counsel's failure to raise that issue on direct appeal.[15]

_____

[15] Ferrell's initial motion did not ask this Court to expand the COA to include the claim regarding trial counsel's effectiveness at sentencing phase closing arguments (Claim II), and in

This timely appeal followed.

## II.

Since Ferrell filed his federal habeas petition after April 24, 1996, Section 2254(d) governs this proceeding. Wilcox v. Fla. Dep't of Corr., 158 F.3d 1209, 1210 (11th Cir. 1998). Accordingly, a court may grant habeas relief only if a state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision is "contrary to" clearly established law if the court arrived at a conclusion opposite to the one reached by the Supreme Court on a question of law or the state court confronted facts that are "materially indistinguishable" from Supreme Court precedent but arrived at a different result. Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision is an "unreasonable application" of clearly established law if the state court identifies the correct governing legal rule

---

ruling on Ferrell's initial motion, we clarified that only Claims I, III, V, and XIV, as presented to the district court, were properly before us. Instead of moving for reconsideration to ask this Court to expand the COA to cover the closing argument, Ferrell filed his briefs on the merits arguing not only Claim I (as it pertained to the sentencing phase), Claim III, Claim V, Issue 8 and Claim XIV, but also Claim II. Only after the State pointed out in its briefing that Claim II was not properly before this Court did Ferrell move to "clarify and/or expand" the COA. We denied his belated motion. We nevertheless consider this claim, in substance, because it is plainly an integral part of Ferrell's claim that trial counsel was ineffective at the penalty phase.

from the Supreme Court's holdings but unreasonably applies it to the facts of the particular defendant's case. Id. at 407. A state court's factual findings are presumed correct unless they are rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Ferrell's two main arguments concern the ineffectiveness of trial counsel at the penalty phase, and the ineffectiveness of appellate counsel in conducting the same search for mitigating evidence to present in support of a motion for a new trial and on direct appeal. To succeed on these Sixth Amendment claims, Ferrell must show both deficient performance and prejudice: he must establish first that "counsel's representation fell below an objective standard of reasonableness," and then that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984); accord Wiggins v. Smith, 539 U.S. 510, 521-522 (2003); Darden v. Wainwright, 477 U.S. 168, 184 (1986). "The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and a state court's decision concerning that issue is presumptively correct." Provenzano v. Singletary, 148 F.3d 1327, 1330 (11th Cir. 1998). However, "the question of whether the strategic or tactical

decision is reasonable enough to fall within the wide range of professional competence is an issue of law not one of fact." Id.

Under AEDPA, we accord deference to a state court's determinations on both Strickland prongs -- performance and prejudice -- so long as the state court reached the merits of the petitioner's claim, and reached both prongs of the Strickland analysis. Moreover, we are instructed to afford state court habeas decisions a strong presumption of deference, even when the state court adjudicates a petitioner's claim summarily -- without an accompanying statement of reasons. Harrington v. Richter, ___ U.S. ___, 131 S. Ct. 770, 780, 784 (2011); Wright v. Sec'y for Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002); see also Renico v. Lett, ___ U.S. ___, 130 S. Ct. 1855, 1862 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings . . . and demands that state-court decisions be given the benefit of the doubt." (citations and internal quotation marks omitted)).

Where the state court did not reach the merits of the claim, however, "federal habeas review is not subject to the deferential standard that applies under AEDPA to 'any claim that was adjudicated on the merits in State court proceedings,'" and instead, "the claim is reviewed de novo." Cone v. Bell, __ U.S. __, 129 S. Ct. 1769, 1784 (2009). In deciding whether a state court actually

48

reached the merits of a claim, the Supreme Court has also instructed us that we should presume "the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington, 131 S. Ct. at 784-85 (citations omitted). There is an "indication . . . to the contrary" where, for example, the state court has denied the petitioner's claim on only one prong of the Strickland test, and, therefore, we review de novo the prong that the state court never reached. See, e.g., Rompilla v. Beard, 545 U.S. 374, 380, 390 (2005); Wiggins, 539 U.S. at 534.

In this case, no one disputes that the Georgia Supreme Court expressly found that Ferrell had failed to satisfy the first Strickland prong -- whether trial or appellate "counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. We, therefore, accord AEDPA deference to both determinations.

A more difficult question arises, however, when we turn to the state court's prejudice determinations. On direct appeal, the Georgia Supreme Court squarely found that Ferrell failed to establish Strickland prejudice from trial counsel's performance, although the record before the state court was sharply limited to the "new" mitigating evidence appellate counsel introduced with the motion for new trial. On habeas review, the Georgia Supreme Court said that it was not revisiting

49

the earlier determinations about trial counsel.  The Georgia Supreme Court also reviewed a radically expanded record of mitigating evidence.  And, notably, the state's high court cited many times to the expanded record and to trial counsel's performance in rendering its ruling about appellate counsel's performance.  See, e.g., 274 Ga. at 406-07 (reviewing the mitigating evidence presented in the habeas record -- including the father's gambling problem and the father's physical abuse of the children, the burning of the family home, and the mother's depression and mental health problems -- to conclude that "[t]hese facts indicate that neither trial nor appellate counsel rendered ineffective assistance").

None of this is surprising because the state court could not effectively review appellate counsel's performance in challenging trial counsel's effectiveness in mitigation without re-examining trial counsel's performance as well.  We are hard pressed to see how appellate counsel could have performed ineffectively here if trial counsel had adequately and constitutionally performed its tasks in the first place.  See DeYoung v. Schofield, 609 F.3d 1260, 1283 (11th Cir. 2010) (observing that in order to ascertain whether appellate counsel was ineffective in failing to raise, or in inadequately raising, a claim of trial-counsel ineffectiveness, a court must "review the merits of the omitted [or inadequately raised] claims"); Owen v. Sec'y for Dep't of Corr., 568 F.3d 894, 915 (11th Cir. 2009) (holding that

50

if issues are without merit, "any deficiencies of [appellate] counsel in failing to raise or adequately pursue them cannot constitute ineffective assistance of counsel").

In other words, whether appellate counsel failed to properly challenge trial counsel's mitigation inquiry focuses on essentially the same corpus of evidence and the same legal questions underlying trial counsel's effectiveness -- which strategies did trial counsel pursue, were those strategies reasonable under the circumstances, and what kinds of penalty-phase evidence was developed, or could reasonably have been developed. Those are exactly the questions the Georgia Supreme Court answered on habeas review, sometimes explicitly, and sometimes implicitly. See, e.g., 274 Ga. at 405 ("Ferrell's trial attorneys, as this Court implicitly found on direct appeal, acted with reasonable professional judgment in focusing largely on the mitigation theory of 'residual doubt' and presenting testimony consistent with that theory . . . Ferrell's appellate attorney attempted to show the limits of trial counsel's preparation for the sentencing phase, but the evidence actually available, most importantly the evidence of trial counsel's strategic decisions and attempts to develop a theory supportable by available testimony and evidence, was not particularly favorable to Ferrell's claim that his trial attorneys rendered ineffective assistance.") (emphasis added); id. at 407

51

("Appellate counsel, like Ferrell's trial attorneys, performed reasonably by obtaining expert assistance in investigating the few issues regarding Ferrell's mental functioning that would have seemed of possible concern to a non-expert and then foregoing arguments not supportable by the opinions of those experts.") (emphasis added); id. (reviewing the mitigating evidence presented in the "trial record, the motion for new trial record, and the habeas record" to conclude that "[t]hese facts indicate that neither trial nor appellate counsel rendered ineffective assistance"). And it did so based on the entire record. See id. at 405 (detailing evidence from the trial (e.g., Ferrell's religious commitment), the motion for new trial (e.g., the burning down of Ferrell's house), and the habeas hearing (e.g., "testimony of three mental health professionals suggesting that Ferrell suffers from organic brain damage, mental illness, an epileptic or seizure disorder, and mental retardation")).

Since the Georgia Supreme Court reviewed the entire record on habeas review and necessarily revisited trial counsel's effectiveness, and expressly and repeatedly reaffirmed its Strickland conclusions about trial counsel, we review its prejudice determination concerning trial counsel's performance through the prism of AEDPA deference. Affording the Georgia Supreme Court's decisions "the benefit of the doubt," Renico, 130 S. Ct. at 1862, we think the wise course here is

52

to examine the Georgia Supreme Court's determinations about trial counsel in this way.  (Nevertheless, under the operative facts and circumstances of this case, our determination about prejudice would be exactly the same, whether measured under the more exacting standards contained in AEDPA or under de novo review.)

The Georgia Supreme Court never reached the prejudice prong, however, when it examined appellate counsel's performance.  Indeed, when addressing the new mental health evidence, its analysis stopped after determining only that the appellate lawyer performed reasonably.  It never discussed, mentioned or suggested the question of whether this evidence would have led to the reasonable probability that the motion for a new trial would have been granted.  The Georgia Supreme Court simply wrote: "Appellate counsel, like Ferrell's trial attorneys, performed reasonably by obtaining expert assistance in investigating the few issues regarding Ferrell's mental functioning that would have seemed of possible concern to a non-expert and then foregoing arguments not supportable by the opinions of those experts."  274 Ga. at 407.

The Georgia Supreme Court's habeas decision is similar to the state habeas decision reached in Wiggins, where the Maryland Court of Appeals concluded its Strickland analysis by discussing only the reasonableness of counsel's performance; it never addressed prejudice.  Wiggins v. State, 724 A.2d 1, 17 (Md.

53

1999) (ending its discussion by saying "[i]t was not unreasonable for [counsel] to choose not to distract from their principal defense with evidence of appellant's unfortunate childhood").  Just as in Wiggins, "our review is not circumscribed by a state court conclusion with respect to prejudice," since the Georgia Supreme Court did not reach this prong of Strickland.  And just as in Wiggins we have no state court judgment to afford deference.  Accordingly, we evaluate this element de novo, just as the district court did.  See 539 U.S. at 534.[16]  (But again, even if we were to review the matter through the lens of AEDPA deference, our conclusion would be the same.)

### III.

### A.    Trial counsel's performance was unreasonable.

At the outset, we turn to the Georgia Supreme Court's conclusion on direct appeal (and reiterated on habeas review) that trial counsel's performance in presenting mitigating evidence during the sentencing phase was not constitutionally deficient.  261 Ga. at 120.  It is almost axiomatic by now that

---

[16] Since the Georgia Supreme Court repeatedly discussed trial counsel's performance on habeas (and since we conclude below that the Georgia Supreme Court unreasonably ruled that appellate counsel did not perform ineffectively in developing the record on trial counsel's ineffectiveness), we consider, for purposes of both the trial-counsel and appellate-counsel claims, the full record that was before the Georgia Supreme Court when it ruled on the appellate-counsel claim.  Cf. Cullen v. Pinholster, __ S. Ct. __, 2011 WL 1225705, *11 n.12 (Apr. 4, 2011) (assuming without deciding that in considering an ineffectiveness claim, it would review "all of the evidence that Pinholster ever submitted in state habeas," including the evidence he submitted during both rounds before the state supreme court).

"strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," but those made after "less than complete investigation" are reasonable <u>only</u> to the extent that reasonable professional judgment supports the limitations on investigation.  <u>Strickland</u>, 466 U.S. at 690-91; <u>accord</u> <u>Wiggins</u>, 539 U.S. at 527-28 (finding ineffective assistance where "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible"); <u>Ford v. Hall</u>, 546 F.3d 1326, 1333-34 (11th Cir. 2008) (holding that in evaluating the reasonableness of an investigation into mitigating circumstances "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further") (citations and quotation marks omitted); <u>Williams v. Allen</u>, 542 F.3d 1326, 1337 (11th Cir. 2008) (holding that "the decision to limit an investigation must flow from an informed judgment") (citations and quotation marks omitted).

In this case, trial counsel conducted a profoundly incomplete investigation, and its judgment to so sharply limit its inquiry fell far outside the wide range of professional competence.  As we see it, the Georgia Supreme Court's conclusion to the contrary amounted to "an unreasonable application of . . . clearly established" Supreme Court law.  28 U.S.C. § 2254(d)(1).

**1.**

For starters, we find unreasonable the conclusion that "Ferrell's trial attorneys . . . performed reasonably by obtaining expert assistance in investigating the few issues regarding Ferrell's mental functioning that would have seemed of possible concern to a non-expert and then foregoing arguments not supportable by" Allsopp's opinion. 274 Ga. at 407. To the contrary, the record amply establishes that trial counsel's mental health investigation was unjustifiably and unreasonably circumscribed. While trial counsel hired Dr. Allsopp as an expert, the mental health evaluation they requested from him was limited to answering only two questions: whether Ferrell was mentally retarded and whether he suffered from any problems that may have affected his waiver of rights for the statements he gave to the police. (RE18 at 216). Based on this sharply limited inquiry, Dr. Allsopp opined only that Ferrell had low average to average intelligence, was not retarded, and had a sufficient level of intelligence and mental status at the time of assessment that would not adversely affect his ability to understand his constitutional rights.

Notably, Allsopp had not been asked to look for evidence of brain damage, was provided no material from counsel other than school records, and was not asked to perform a clinical interview, or do anything else for possible use in

56

mitigation. In fact, Allsopp's marching orders focused only on Ferrell's ability to interact with the police; counsel did not ask, nor did Allsopp look for whether Ferrell had any mental illness that may have affected him during the crime. Counsel's use of Allsopp was unreasonably constricted in this case because of the wide range of mental health issues other than retardation and competency that could have been relevant (and were relevant) to Ferrell's mitigation investigation, and the many red flags that had been raised about Ferrell's mental health throughout the proceeding. See Blanco v. Singletary, 943 F.2d 1477, 1503 (11th Cir. 1991) ("[T]here is a great difference between failing to present evidence sufficient to establish incompetency at trial and failing to pursue mental health mitigating evidence at all. One can be competent to stand trial and yet suffer from mental health problems that the sentencing jury and judge should have had an opportunity to consider.").

This record reveals numerous, obvious indicators that should have led counsel to pursue a more comprehensive mental health investigation. To begin with, Ferrell's first lawyer, August Siemon, worked only briefly with Ferrell but still strongly suspected that Ferrell suffered from mental health problems that were "overt and fairly apparent to anyone who cared to look closely." He explained that: (1) Ferrell's eyes would glance away for several seconds and suddenly come

57

back, as though his face would go blank, and then become animated once again; (2) Ferrell did not seem particularly worried about what was happening -- his affect was wrong, given the circumstances; (3) he talked about his religious beliefs excessively, thought God would take care of him, and talked about how God had spoken to him; and (4) the facts of the case were so incredible one had to question Ferrell's mental functioning, especially since Ferrell carried the bullet casings around in his pocket the entire day until he reached the police station and they were discovered on his person.

Similarly, defense counsel's investigator, Phyllis Corder -- on whom Ferrell's trial counsel heavily relied for investigating both phases of trial -- observed that "there was evidence that [Ferrell] had some kind of mental disorder" because he (1) was obsessively religious, and spoke directly with God, who told him not to worry, and (2) had a strange demeanor at trial, laughing and smiling inappropriately throughout the proceedings, which brought into question his mental state, and indicated that something was wrong other than mental retardation.

Moreover, and perhaps more significantly, during the trial itself, Ferrell had a seizure, causing him to fall onto the floor, shake and speak gibberish. When it ended, it seemed to investigator Corder that Ferrell did not know what had

happened, or indeed that anything had in fact happened. The episode was described by her this way: Ferrell "fell onto the floor, shaking and speaking gibberish. Really, it sounded like a foreign language[,] like speaking in tongues . . . . There was no question in my mind that this was a genuine seizure." In fact, Corder thought that "the trial should have been stopped and Eric should have been examined medically or had some sort of evaluation, but it all happened extremely quickly." Both defense lawyers, Schneider and Sheffield, testified that they too had witnessed the seizure. Remarkably, defense counsel never sought so much as a continuance to determine if there was some mental health issue that caused the seizure or to evaluate the defendant's mental health further.

Nor, despite Ferrell's obvious mental disabilities, did defense counsel ever ask any of Ferrell's family -- the ones who were called to testify anyway -- about any topics related to Ferrell's mental health. Yet, as this record fully describes, these witnesses could have testified about how Ferrell had visions and suffered depression, how a young Ferrell had received multiple head injuries and ensuing hospitalizations, how Ferrell exhibited manic moods, when he would never stop working, how "slow" Ferrell was and how long it took him to catch on to things, or how Ferrell's mother suffered from mental health problems (including suicidal ideations) as well. But counsel never bothered to ask the very witnesses who

59

appeared before the court to testify about anything that would have illuminated Ferrell's mental state.

In the face of these obvious indicators that Ferrell had substantial mental health issues, we cannot say it was reasonable for the Georgia Supreme Court to conclude that trial counsel performed adequately and effectively in limiting their mental health mitigation investigation in the way that they did, or in failing to follow up on Ferrell's mental health as their representation proceeded.

What's more, because counsel did not seek any non-character mitigating evidence from the list of witnesses Ferrell gave them, counsel did not learn from these witnesses as well things that would have compelled them to dig deeper into the defendant's mental health. Thus, for example, an employer and a neighbor described in their habeas affidavits how Ferrell would have "spells, where he'd just stare off for a few seconds or so," and "had a way of looking sometimes, like [something] was loose there, then he'd snap back to you." Similarly, the habeas affidavits of Ferrell's brother Wilbert Jr., his father, an employer, and a friend described Ferrell's manic moods, when he would "stay working all day and into night," or would "chatter" and run "his mouth in overdrive," as contrasted with his "quiet" moods. Likewise, testimony from his brother Darrell and an employer described how Ferrell "was always a bit different from" the other children, and had

60

"funny ways." His brothers, two of his teachers, and a friend described how "slow" Ferrell was, and how long it took him to catch on to things.

Ferrell's mother and father also described how Ferrell made repeated trips to the hospital as child when he once was hit in the head by a 2x4, twice was knocked unconscious while playing ball, and had headaches after a car accident. Ferrell's mother Ruby described how, like her, Ferrell had seen his dead grandmother's spirit in their house while growing up. In addition, a neighbor described how mental health issues ran in Ruby's family. And finally, Ruby's hospital records confirmed that she heard voices, had visions, experienced "rage blackouts," felt urges to harm her children, and had suicidal ideations. This record -- providing, at the very least, anecdotal evidence of Ferrell's brain damage, epilepsy, and bipolar disorder -- undoubtedly would have given counsel still more reason to investigate Ferrell's mental health.

In fact, in conducting the non-expert investigation -- which sought to interview 40-45 witnesses -- the investigators asked only statutory character evidence questions of the potential witnesses, and followed up only if they said anything positive about Ferrell. (RE41 at 17-18). In particular, Corder and others asked the witnesses about Petitioner's reputation in the community. (RE42 at 498-515, 525-27). Yet, the range of relevant mitigation evidence is far wider than

61

reputation. See Brownlee v. Haley, 306 F.3d 1043, 1070 (11th Cir. 2002) (mitigating evidence includes "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.") (quoting Lockett v. Ohio, 438 U.S. 586, 604 (1978)); see also Porter v. McCollum, __ U.S. __, 130 S. Ct. 447, 452-53 (2009) (holding -- in a case in which the penalty phase took place in 1988, the same year as Ferrell's -- that "[i]t is unquestioned that under the prevailing professional norms at the time of Porter's trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background'") (quoting Williams, 529 U.S. at 396); Bobby v. Van Hook, 130 S. Ct. 13, 17 (2009) (recognizing that in 1985, the ABA standards -- which we can look to as "guides" provided that "[i]nformation concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant [to a mitigation investigation], as will mitigating circumstances surrounding the commission of the offense itself").  Because Ferrell's counsel failed to conduct a mitigation investigation beyond Ferrell's character, they failed to uncover additional, obvious evidence of serious mental illness, further compounding our conclusion that the Georgia Supreme Court's failure to find their mitigation investigation deficient was unreasonable.

## 2.

Not only did counsel's unreasonably constricted mitigation investigation fail to uncover relevant mental health evidence in Ferrell's favor, it is also troubling for several other reasons.  First, had counsel asked <u>any</u> questions beyond Ferrell's character, they would have discovered compelling evidence of his abused and impoverished childhood.  According to his brothers and neighbors, Ferrell's father Wilbert had a serious gambling problem that profoundly affected the family.  His brothers and mother also explained how their father used to beat the boys regularly, sometimes stripped naked, and how Ferrell was unloved by his father and bore the brunt of his father's considerable anger.  Even Wilbert Sr. admitted he beat his sons with whips and strops.  Ferrell's brothers and neighbors also relayed how the Ferrells lived in run-down shacks, how they were repeatedly evicted from their homes, how when the defendant was only five one of these homes burned to the ground, and how the boys often went hungry.  And his brothers and neighbors revealed that Ferrell's mother Ruby was depressed all the time, that she, like the defendant, had attempted suicide, that she had nerve problems, that she would shut herself off, and that she was "scary" to the boys.

Second, the very witnesses who were called by the defense to testify at Ferrell's trial -- his parents and brother Stanley -- could have provided detailed

information about his deeply troubled mental health and his childhood if they had ever been asked. So even if, as counsel claimed, they could not have found other witnesses to testify for Ferrell in mitigation, they could have elicited significant, and powerful, additional mitigating evidence from the witnesses who were willing to testify, and did testify on Ferrell's behalf, if counsel had only asked these witnesses about the defendant's background and childhood.

Third, this is not a case where Ferrell's counsel reasonably believed that it would have been useless to follow up on Ferrell's background. All they learned during their investigation was that their <u>character</u> investigation was not productive. But they found nothing to suggest that an investigation into Ferrell's background and upbringing would have been useless, or opened the door to potentially damaging rebuttal evidence. <u>See</u> <u>Wiggins</u>, 539 U.S. at 525 ("Indeed, counsel uncovered no evidence in their investigation to suggest that . . . further investigation would have been fruitless[.]"). Other than relying on the investigator, trial counsel themselves did not speak with any penalty-phase witnesses, or potential witnesses, aside from the parents, until "immediately following the guilt-innocence phase, while the jury was out." (RE18 at 214).

Fourth, counsel claimed that they chose "residual doubt" as a strategy only because they could find no other reason to offer the jury not to impose death.

64

(RE18 at 213). This explanation is not persuasive. The long and the short of it is that defense counsel had nothing else to rely on because they looked for nothing else. See Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir. 1995) (citing a long line of decisions showing that "our case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options") (internal citations and quotation marks omitted); see also Sears v. Upton, 130 S. Ct. 3259, 3265 (2010) ("[T]hat a theory might be reasonable, in the abstract, does not obviate the need to analyze whether counsel's failure to conduct an adequate mitigation investigation before arriving at this particular theory prejudiced [the petitioner]."). By failing to conduct any reasonable investigation into the defendant's background and upbringing, defense counsel's post-hoc justification for their residual doubt defense -- that they could find no alternative sentencing strategy -- is completely undermined, and fails to explain adequately why they unreasonably limited their mitigation investigation.

Put simply, because of counsel's limited character investigation -- which asked, essentially, only whether Ferrell was trustworthy and had a good reputation -- counsel did not uncover readily available mitigating evidence of Ferrell's powerful mental health issues or his abused and difficult childhood, and failed to adequately utilize the witnesses who did testify on his behalf. Nor did counsel's

65

approach reveal anything to suggest that a more comprehensive investigation would have been fruitless.

**3.**

As we see it, the conclusion that trial counsel did not perform ineffectively is even more unreasonable when measured against the actual approach trial counsel employed at sentencing. We recognize, as the State argues, that "residual doubt" can be a valid approach, especially where, as here, Petitioner's witnesses were also the victims' family members. "Creating lingering or residual doubt over a defendant's guilt is not only a reasonable strategy, but 'is perhaps the most effective strategy to employ at sentencing.'" Parker v. Sec'y for the Dep't of Corr., 331 F.3d 764, 787-88 (11th Cir. 2003) (quoting Chandler v. United States, 218 F.3d 1305, 1320 (11th Cir. 2000) (en banc)); see also Tarver v. Hopper, 169 F.3d 710, 715-16 (11th Cir. 1999). Thus, the time and effort an attorney expends in preparing the guilt phase of a capital case may continue to aid with the sentencing phase. See Parker, 331 F.3d at 787 (citing Tarver, 169 F.3d at 715).

But in this case, it is hard to say that counsel pursued much of a "residual doubt" strategy at sentencing. See Smith v. Spisak, 130 S. Ct. 676, 691 (2010) (Stevens, J., concurring) ("[S]urely, a strategy can be executed so poorly as to render even the most reasonable of trial tactics constitutionally deficient under

66

Strickland.").  Most importantly, their "residual doubt" theory was powerfully

undercut by the very nature of the closing argument defense counsel made at the

penalty phase.  As the record shows, defense counsel told the jury in closing

argument: (1) that Ferrell's basic story presented by the defendant himself from the

witness stand that two gunmen killed the victims in a revenge killing with his gun,

and then gave him back his revolver along with some money, was "absurd," "hard

to swallow," "hard to believe," "wild," and "ludicrous" (RE13 at 1704-15); (2) that

the jurors had to find only one aggravating factor for the death penalty, that they

"unquestionably" had already done so, and that they could legitimately sentence

Ferrell to death (RE13 at 1697); (3) that counsel had the "unpleasant duty" of

arguing that two deaths "by execution" did not warrant the death penalty (RE13 at

1699); (4) that the crime was in fact an enormous one, based upon his experience

(RE13 at 1699); and (5) that this was a circumstantial evidence case in which all

the circumstances pointed toward Ferrell's guilt.  (RE13 at 1704).

Moreover, nearly every time defense counsel seemed to suggest residual

doubt -- either by saying that the jury did not know what happened in that house

that day, or by asking the jury if they were sure Ferrell committed the crime --

counsel immediately retreated, by saying that "we don't know why" and Ferrell

"isn't going to tell us," by "assum[ing]" that Ferrell did it, or by reiterating that

67

Ferrell's story of innocence was "absurd," "hard to swallow," "hard to believe," "wild," and "ludicrous." (RE13 at 1698-99). Counsel even went so far as to declare to the jury that "[n]o rational jury would have found otherwise in the guilt-innocence phase because of the ludicrousness of that story. <u>You could try this case a thousand times before a thousand juries and you'd get the same result; we've all known that from day one</u>." (RE13 at 1699 (emphasis added)). By no reasonable calculus can we say that this argument was consonant with a residual doubt claim.

Indeed, in other cases where courts have accepted the efficacy of residual doubt defenses, <u>actual</u> residual doubt was urged by defense counsel. Thus, to illustrate, in <u>Hammond v. Hall</u>, 586 F.3d 1289, 1334 (11th Cir. 2009), we noted that "[a]t sentencing Hammond's trial counsel did argue residual doubt to the jury, not exclusively but forcefully," and cited the following statements in support: (1) "[The prosecutor] wants you to think that he's sitting here with all this evidence. Where is it? Where is it? That's what he wants you to believe"; (2) "[The prosecutor] wants you to convict this man and say how vicious he is, because he came into this court and said I am not guilty of murder. I did not kill anyone. And I haven't killed anyone"; and (3) "[A]nything [the defendant's] been involved with, there may have been some violent acts, but there was an absence of one thing, and

68

that was a death. But there was not an absence of death with [the other assailant], was there? [The other assailants] are the two that was behind this entire act, but they want this man to pay for it."  Similarly, in <u>DeYoung v. Schofield</u>, 609 F.3d 1260, 1278 (11th Cir. 2010), counsel argued residual doubt by "tr[ying] to paint [another individual] as being in control on the night of the murders, and to suggest other persons may have been involved."

In this case, counsel's argument can more accurately be described as evincing a "mercy-despite-guilt strategy" -- asking the jury to spare Ferrell's life, even if he did it.  Counsel asked the jury to consider that he had seen even more egregious homicides than the murder of a grandmother and cousin, that Ferrell is not "completely" the animal who should be "snuffed out for the protection of society," and that they could be merciful even if Ferrell had not been.  (RE13 at 1701-02).  And counsel's argument expressly raised for the jury the question hovering over the entire trial, <u>why</u> Ferrell did it -- the very question that could have been answered by the powerful mitigating mental health evidence easily developed later.  Counsel repeatedly emphasized that no one knew why Ferrell had committed the murders, and questioned why Ferrell "who, to all accounts, loved these folks that he murdered . . . who is not a mad-dog killer, had never done this sort of thing before -- why would he do this?"  (RE13 at 1702; <u>see also</u> RE13 at 1698).  Even

69

though counsel asked "why" Ferrell may have committed the almost inexplicable double murder of his beloved grandmother and his fifteen-year-old cousin, counsel never conducted an investigation that would have begun to answer this question, and never offered the jury the slightest reason.

In addition to counsel's closing argument, counsel's preparation for sentencing did little to further their alleged "residual doubt" strategy. As we've noted already, Schneider admitted that he did not advise the testifying witnesses about the nature of his inquiry. (RE18 at 214-16, 228). The witnesses later said that they had no idea about what kinds of material they could present in mitigation. Although Ferrell's mother, father, uncle, and brother Stanley actually testified that they did not believe Ferrell committed the murders, counsel did not so much as make a single reference to their testimony in his closing argument.

In short, the record before us establishes that counsel at most pursued a half-hearted residual doubt defense, and then eviscerated that defense with his observations about the inadequacy of defendant's explanations. The real thrust of the defense at sentencing was not residual doubt, but rather, mercy.

**4.**

All in all, we conclude that the Georgia Supreme Court's ultimate ruling that trial counsel's performance was not ineffective is an unreasonable application of

70

Strickland. As the Supreme Court has held, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Wiggins, 539 U.S. at 528. In Wiggins, where the record showed that "counsel put on a halfhearted mitigation case," id. at 526, the Supreme Court found unreasonable the "the scope of counsel's investigation," where counsel failed to expand their investigation beyond the presentence investigation report and one set of records they obtained. Id. at 528-29. The Supreme Court explained:

> Counsel's . . . decision to end their investigation when they did was neither consistent with the professional standards that prevailed in 1989, nor reasonable in light of the evidence counsel uncovered in the social services records -- evidence that would have led a reasonably competent attorney to investigate further. Counsel's pursuit of bifurcation until the eve of sentencing and their partial presentation of a mitigation case suggest that their incomplete investigation was the result of inattention, not reasoned strategic judgment. In deferring to counsel's decision not to pursue a mitigation case despite their unreasonable investigation, the Maryland Court of Appeals unreasonably applied Strickland. Furthermore, the court partially relied on an erroneous factual assumption. The requirements for habeas relief established by 28 U.S.C. § 2254(d) are thus satisfied.

Id. at 534.

So too here: counsel ignored the many red flags concerning the available mitigating evidence about Ferrell's mental health, including his visible facial movements, strange "affect" or "demeanor," obsessive religious beliefs, odd

71

behavior following the crime, and most notably, the seizure he had in front of counsel and the court during the trial. Counsel also utterly failed to investigate Ferrell's upbringing, for no apparent reason, which would have uncovered evidence about Ferrell's impoverished and abused childhood, and troubled mental health. It is obvious from this record that defense counsel could not have made a fully informed decision when settling on their "strategy," hardly pursued a residual doubt strategy in Ferrell's defense in any event, and failed to investigate mitigating evidence even though it could have provided the jury with a plausible answer to many of the questions they raised and supported the mercy defense they actually ended up using. As a result, Ferrell was deprived of the effective assistance of counsel during the penalty phase of his trial. Because the Georgia Supreme Court deferred "to counsel's decision not to pursue a mitigation case despite their unreasonable investigation," Wiggins, 539 U.S. at 534, its conclusion that trial counsel performed effectively was an objectively unreasonable application of Strickland.

**B.    Trial counsel's performance resulted in prejudice.**

In order to sustain a Sixth Amendment claim of ineffective counsel, Ferrell must also establish prejudice -- that but for counsel's unprofessional performance, there is a reasonable probability the result of the proceeding would have been

different.  See Strickland, 466 U.S. at 694. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding," because "[v]irtually every act or omission of counsel would meet that test." Id. at 693.  Nevertheless, a petitioner "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." Id.  Rather, where, as here, a petitioner challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695; Putman v. Head, 268 F.3d 1223, 1248 (11th Cir. 2001). We presume a reasonable sentencer. See Williams v. Allen, 542 F.3d 1326, 1342 (11th Cir. 2008) (citing Strickland, 466 U.S. at 695 ("[T]he idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency[,] . . . are irrelevant to the prejudice inquiry.")).

The Supreme Court has instructed that "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." Wiggins, 539 U.S. at 534. "In that process, what matters is not merely the number of aggravating or mitigating factors, but their weight." Reed v. Sec'y, Fla. Dep't of Corr., 593 F.3d 1217, 1240-41 (11th Cir. 2010).

73

With this in mind, we conclude that the Georgia Supreme Court unreasonably determined that there was no reasonable probability of a different outcome at trial had the jury heard the totality of mitigating evidence. First and foremost, the "new" mitigating evidence is consistent, unwavering, compelling, and wholly unrebutted. As the Georgia Supreme Court accepted on habeas review, three mental health professionals averred that Ferrell suffers from organic brain damage, bipolar disorder, an epileptic or seizure disorder, and borderline mental retardation. In addition, the record shows that Ferrell's father regularly abused his children, especially Ferrell, waking them in the middle of the night to beat them, sometimes stripped naked, with razor strops, fan belts, and old used belts. The family also lived in fear of loan sharks and those to whom their father owed gambling debts. And Ferrell's mother suffered from clinical depression, suicidal ideations, rage blackouts, and urges to physically hurt her children.

Second, the evidence of Ferrell's mental illness measurably weakens the aggravating circumstances found by the jury. As argued by the prosecutor, Ferrell killed his grandmother, an elderly woman, and his cousin, a fifteen-year-old boy; it was a senseless crime, since he killed his sleeping cousin; it was coldblooded, execution-style, and planned out; and Ferrell appeared unaffected afterwards. In particular, the prosecutor emphasized that "after executing his grandmother and his

cousin, [Ferrell] walked slowly up the street to his mother's house . . . fixed a cup of hot chocolate . . . plopped down on the couch, watched TV with the remote . . . and dozed off for a while." (RE13 at 1670-96). Following this argument, the jury found two statutory aggravators of felony murder, and one statutory aggravator because the murder of Petitioner's grandmother was outrageously and wantonly vile, horrible or inhuman in that it involved torture and depravity of mind.

However, the experts consistently maintained (again without any rebuttal) that organic brain damage to Ferrell's frontal lobe has led to impaired insight, impaired judgment, increased impulsiveness and explosiveness, emotional and mental dysfunctions, decreased ability to plan and understand consequences, and inability to process information in stressful situations. The experts further opined that due to Ferrell's temporal lobe epilepsy, he is hyperreligous and hypergraphic, has grandiose ideations, takes actions that are sudden, unplanned and undirected, is overtaken by powerful emotions (anger or fear), hallucinations or flashbacks, and has altered behavior after seizures that results in dullness, unawareness and confusion.

Cumulatively, say the experts, Ferrell has increased impulsivity, decreased sound judgment, and takes actions that are not entirely volitional. Thus, the mental health expert opinions would have served to reduce the volitional nature of the

75

crime, as well as Ferrell's ability to plan and act rationally, and as a result, undercut the senselessness and cold-blooded nature of the crime as stressed by the prosecutor, and, importantly, explain Ferrell's odd, disaffected behavior afterwards. Significantly, all of these circumstances would have been relevant as mitigating evidence under Georgia law, which instructs the judge and jury in a capital case to consider "any mitigating circumstances" in determining whether to impose the death penalty. Ga. Code Ann. § 17-10-30(b).[17]

Third, because defense counsel did not pursue much of a residual doubt defense, instead mostly focusing on mercy, mitigating evidence of Ferrell's mental health and childhood would have easily and directly supported the approach counsel offered at sentencing. Similarly, counsel's repeated questions to the jury about why Ferrell had committed the crime could have been answered by

---

[17] The proposition that the mitigating evidence of Ferrell's mental illness would have measurably weakened the aggravating circumstances found by the jury finds further support in case law. For example, in Williams, the petitioner presented on habeas evidence of his childhood, "filled with abuse and privation," and of his borderline mental retardation. 529 U.S. at 397-98. The Supreme Court concluded that this evidence "might well have influenced the jury's appraisal of his moral culpability," and was "consistent with the view that in each case his violent behavior was a compulsive reaction rather than the product of cold-blooded premeditation." Id. The Court further observed that "[m]itigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." Id. See also Hardwick v. Crosby, 320 F.3d 1127, 1164 (11th Cir. 2003) ("[P]sychiatric mitigating evidence not only can act in mitigation, it also could significantly weaken the aggravating factors."). The record of Ferrell's mental health issues -- including unwavering evidence of his organic brain damage, bipolar disorder, seizure disorder, and mental retardation -- is at least as troubling as the type of evidence described in Williams, where the defendant suffered repeated head injuries, and might have had "mental impairments organic in origin." 529 U.S. at 370.

76

providing mitigating evidence about his mental health. Instead, defense counsel's argument had little to support it, and raised questions for the jury that counsel was wholly unable to answer, which only made Ferrell's actions appear all the more incomprehensible.

Fourth, the testimony from witnesses at the penalty phase of Ferrell's original trial actually was very sparse. Five family members averred that they did not believe Ferrell committed the murders; his father maintained that Ferrell did not get into any juvenile trouble; his mother and brother asked the jury to have mercy on him; and his brother said that Ferrell loved the victims, and had committed himself to Christ before the murders. (RE13 at 1632-35). As a result, the jury heard absolutely nothing about the substantial mitigating evidence that we have described in detail. As far as the jury knew, Ferrell did not suffer from brain damage; his emotional stability, impulse control, and judgment were perfectly normal; he could plan and understand the consequences of his actions as easily as the next person. The jury labored under a profoundly misleading picture of Ferrell's moral culpability because the most important mitigating circumstances were completely withheld from it.

For these reasons, we conclude that the Georgia Supreme Court unreasonably determined there was no reasonable probability that the outcome of

the penalty phase would have been different had the jury heard the totality of mitigating evidence. Ferrell has satisfied both Strickland's performance and prejudice prongs. Accordingly, we reverse the district court's decision and grant habeas relief on Ferrell's ineffective-assistance-of-trial-counsel claim at the penalty phase.

## IV.

Ferrell also claims that his appellate counsel rendered ineffective assistance in perfecting a motion for a new trial and the appeal. A petitioner alleging ineffective assistance of appellate counsel "must show that counsel's performance was so deficient that it fell below an objective standard of reasonableness as well as demonstrate that but for the deficient performance, the outcome of the appeal would have been different." Black v. United States, 373 F.3d 1140, 1142 (11th Cir. 2004); see also Clark v. Crosby, 335 F.3d 1303, 1312 n.9 (11th Cir. 2003) ("[T]he only question under the prejudice prong of the Strickland test is whether there was a reasonable probability that the appellate court, [had appellate counsel not been deficient,] . . . would have granted [the petitioner] a new trial.").

### A.    Appellate counsel's performance was unreasonable.

We turn then to the Georgia Supreme Court's conclusions -- rendered on habeas review -- that: (1) Ferrell's appellate counsel did not perform ineffectively

in obtaining and presenting testimony about Ferrell's background in support of his motion for a new trial; and, (2) appellate counsel performed reasonably by obtaining expert assistance in investigating Ferrell's mental functioning. 274 Ga. at 405, 407. We conclude, however, under the circumstances surrounding this case that Stewart's investigations into Ferrell's mental health and background were inadequate and unreasonable, appellate counsel's performance was undeniably ineffective, and the Georgia Supreme Court's conclusions were unreasonable.

To begin, Stewart was a sole practitioner who had never handled a motion for a new trial in a capital case. (RE40 at 57). Stewart complained at the evidentiary hearing that trial counsel's expert, Allsopp, had rendered nothing more than a pretrial competency determination. (RE40 at 47-48). But as this ample record shows, she herself had asked her expert psychiatrist, Dr. Cohen, <u>only</u> to determine Ferrell's competency and sanity at the time of trial. (RE41 at 2, 91).[18] Cohen was given Dr. Allsopp's earlier report and a copy of Dekalb County jail

_____

[18] There is nothing in the record establishing that Stewart asked Dr. Cohen to look beyond competency and sanity. Stewart's very own testimony admitted that she had asked Cohen "to determine if Eric was sane at the time of the offense and whether he was competent to stand trial and understand <u>Miranda</u>." ( RE41 at 9). Indeed, Dr. Cohen consistently averred that Stewart had asked him "to determine if Mr. Ferrell was competent to stand trial and understand his <u>Miranda</u> rights, and whether he was sane at the time of trial. She was attempting to ascertain whether trial counsel had used their mental health expert effectively." (RE41 at 91). He further reiterated that "because my evaluation was <u>limited</u> to competency and sanity, I did not assess Mr. Ferrell's intellectual functioning." (RE41 at 103 (emphasis added)). The record is clear that Cohen understood that his task was to determine Ferrell's competency and sanity.

79

records reflecting that Ferrell was on suicide watch. Cohen reported that Mr. Ferrell told him he heard voices, including the voice of the devil inside his head. (RE 41 at 91, 103).

Yet Stewart did nothing with the information Cohen had given her. Stewart put it this way: "I did not know what to do with the information Dr. Cohen had given me so I simply did nothing with it." (RE41 at 9). Moreover, Stewart did not follow up with Dr. Cohen, even though she knew from her conversations with Ferrell's mother Ruby that Ferrell had seen visions in the past, (RE41 at 9), she knew about Ferrell's seizure during the penalty phase of trial, (RE41 at 9, 10), and she knew about Ruby's nervous breakdown. (RE41 at 8).

Notably, she did not tell Cohen about any of these facts (RE41 at 10) -- facts that would have informed Dr. Cohen's mental evaluation. Dr. Cohen later expressly averred that Ferrell's report of hearing voices is consistent with schizophrenia, the manic phase of bipolar disorder, and temporal lobe epilepsy, or complex partial seizure disorder, but unfortunately, he "had no background materials indicating there was any history of mental illness." (RE41 at 103). Cohen added that "[i]f I had been given information related to Mr. Ferrell's history of hearing voices and hallucinations, and history of head injuries, I would have referred him for neuropsychological testing." (RE41 at 103).

Since Stewart withheld these powerful "red-flags" from Cohen, it was an unreasonable application of Strickland for the Georgia Supreme Court to excuse Stewart's performance simply by suggesting that she raised issues "that would have seemed of possible concern to a non-expert and then fore[went] arguments not supportable by the opinions of those experts," and that "she performed as a reasonable attorney would have by obtaining a mental health expert to meet with Ferrell, to review the findings of the mental health expert employed by trial counsel, and to examine the mental health records created during Ferrell's incarceration." 274 Ga. at 407.

Unlike many cases in our circuit, this is not a case where counsel had no idea that the petitioner may have had mental health issues. Cf. Housel v. Head, 238 F.3d 1289, 1296 (11th Cir. 2001) (counsel not ineffective for failing to pursue mental health investigation where counsel observed nothing unusual about the petitioner's behavior, and even testified that the petitioner was one of counsel's "most intelligent" clients); Holladay v. Haley, 209 F.3d 1243, 1252 (11th Cir. 2000) (counsel not ineffective for failing to pursue mental health investigation where counsel found the petitioner to be cooperative, articulate, and affable); Williams, 185 F.3d at 1239 (counsel not ineffective for failing to pursue mental health investigation where counsel had no problems communicating with the

81

petitioner, found the petitioner to be intelligent, attentive, cooperative, polite, and interested in what was happening, and found that petitioner asked intelligent questions and responded intelligently to counsel's questions).

In sharp contrast, Stewart knew many things that readily implicated Ferrell's mental health issues -- including his visions, his seizure in open court, his mother's nervous condition, and the fact that he was on suicide watch -- yet only requested, and subsequently received, a competency and sanity evaluation from the expert. We can discern no reasonable basis for suggesting that the limits Stewart placed on her investigation of Ferrell's mental health were reasonable. In fact, as a result of Stewart's failure to provide initially relevant information to Dr. Cohen, his report failed to address compelling information concerning Ferrell's mental health at the motion for a new trial.

It was also unreasonable to conclude that Stewart's "other" mitigation investigation was not deficient. Stewart presented three of the same family members who had testified at trial in an attempt to show that they could have provided mitigating testimony. But Stewart did not elicit the kind of mitigating evidence that she claimed she sought to establish -- even though she knew about some mitigating facts of Ferrell's life, including the father's gambling and the family's dire poverty (RE41 at 8), and these very witnesses could have testified

82

about them. Thus, for example, Ferrell's uncle, Hubert Bailey, was not asked about the father's gambling, or how the family had no food or could not pay rent, even though he described these circumstances in his state habeas affidavit. Stewart never elicited from Ferrell's brother, Stanley, that their father gambled and drank, that the family received threats from gambling debts, or that the gambling left the family unable to pay rent or buy food or clothes, even though he described these circumstances in his state habeas affidavit. She did not even elicit any testimony from Wilbert Sr. himself about his gambling. So even though Stewart was aware of certain mitigating aspects of Ferrell's background, she unreasonably did little, if anything, to uncover or elicit further mitigating evidence.

Stewart failed to develop this mitigating evidence even though it was readily available and she had every reason to inquire further. Stewart even pointed out during Stanley's testimony in the motion for new trial hearing that trial counsel had not explained to Stanley that "it would be helpful to illustrate what you were saying with any facts . . . about Eric's growing up." (RE17 at 110). But Stewart herself never used the interview sheets to track down the witnesses and ask them these "helpful" questions about Ferrell's "growing up."

Nor, more importantly, did she dig deeper with the witnesses she did have. Had she done so, by asking the very family members who testified for her, relevant

83

mitigating evidence -- about the effects of the mother's serious mental illness, the direness of their situation, or the father's continued beatings of Ferrell -- would have come to light. In particular, Ferrell's brother Stanley could have testified that "Eric was [our father's] least favorite," and "received the brunt of our father's beatings," which "happened quite frequently, weekly at least." (RE41 at 136). Even Wilbert Ferrell, Sr. himself could have revealed that "I used switches and my belt to whip [the boys], because kids need whipping and to be chastised strongly." (RE41 at 158). Additionally, Stewart knew that one of the witnesses -- Eletha Dunans -- had told trial counsel's investigator good things about Ferrell, yet trial counsel never followed up with her. (RE42 at 527, RE41 at 2). But Stewart did not follow up with her either, and as a result, could not directly counter trial counsel's testimony that there was no one who said anything favorable who was not called to testify. (RE18 at 223). Stewart has offered no reason for failing to delve into any of these facts.

In addition, Stewart affirmatively presented harmful testimony when she called Catherine Shaw, the mother of Ferrell's children, to testify. Stewart asked Shaw on the stand whether she would have asked the jury at trial, had she testified, to spare Ferrell's life, and Shaw responded that she could not say. Stewart recognized later that "I was completely surprised by her statement that she did not

know whether she supported life or death for Eric. Had I known she would give such damning testimony, I would not have called her as a witness." (RE41 at 10-11). By calling Shaw without knowing in advance what she might say, Stewart elicited still further damaging testimony that was added to the record.

Stewart also failed to speak with the investigator Phyllis Corder regarding how the defense prepared for mitigation at sentencing, even though she knew Corder had conducted virtually all of the investigation herself. (RE40 at 52-53). Nor did Stewart so much as reference the limited nature of the inquiry conducted by Corder or the limited witness sheet questions Corder employed.[19]

Quite simply, Stewart did not perform like any reasonable appellate counsel would have, and the Georgia Supreme Court's conclusions that Stewart did not

---

[19] Stewart also failed to make a written argument on any of these points before the state trial court. Stewart testified that "the issue of mental health expert and ineffectiveness of counsel" was "discuss[ed]" and "was apparent on the record with Dr. Allsopp's report," and that she raised both "the issue that [trial counsel] didn't prepare their mitigation witnesses properly for the sentencing phase of the trial," and "the issue that they didn't present certain witnesses during mitigation phase of the trial, such as school teachers." (RE40 at 56). However, as the record shows, Stewart raised the issue of ineffectiveness in the motion for new trial, but did not detail any of the particulars (other than mentioning "the conflict of interest issue"), and instead said that she would "fil[e] a supplemental brief to address the particular areas raised by the testimony or other evidence which comes out at the hearing." (RE1 at 195). In her supplemental brief, she asked the court to analyze "whether there was full investigation on various issues or facets at trial, whether the actions of counsel were reasonable in light of any articulated strategy on specific parts of the trial," or were unreasonable. (RE1 at 241). But the remainder of the brief did not otherwise explain the mitigating evidence claim; it focused only on conflict of interest. (RE1 at 242-47).

render ineffective assistance of counsel in investigating Ferrell's mental health, abused background, and upbringing are unreasonable applications of Strickland.

**B.    Appellate counsel's performance was prejudicial**.

As we have explained, we review de novo whether Ferrell failed to establish Strickland prejudice from appellate counsel's performance because the Georgia Supreme Court did not address the issue at all on habeas review.  We conclude, as we did earlier in the trial counsel context, that Ferrell has established prejudice. First and foremost, the record of mitigating testimony presented in the motion for new trial hearing was limited.  Notably, there was no testimony at the motion for new trial stage about: (1) the father's beatings, how he woke the children up, stripped them, and beat them for no reason in the middle of the night, and how he singled out Ferrell for special abuse; (2) the father's drinking and gambling, how the family lived in fear of loan sharks and those to whom the father owed money, and how the gambling got the family repeatedly evicted; (3) Mrs. Ferrell's rage blackouts, urges to kill her children, and suicide attempt and its effect on the children; (4) Ferrell's attempted suicide at age 11, following his mother's attempted suicide; (5) how deeply the fire affected the boys; (6) the family's hunger, lack of clothing, and tin roof shack without indoor plumbing; (7) Ferrell's history of traumatic losses of consciousness and head injuries; or, most

86

significantly, (8) Ferrell's mental health disabilities, or the effects of these disabilities on his behavior.

In addition, some of the testimony Stewart elicited at the motion for new trial was inaccurate and left a false impression. Thus, for example, Ferrell's brother Stanley said their father "missed appropriate funds" -- which sounded like some accounting error, rather than rampant gambling that left the family destitute and often homeless. Cf. Williams, 542 F.3d at 1342 (finding prejudice where, among other things "evidence introduced in the Rule 32 proceedings contradicted factors expressly relied upon by the trial judge as grounds for imposing the death penalty"). Similarly, Stewart did not ask Wilbert Ferrell about his gambling and its attendant hardships on the family, and instead elicited testimony that he worked two jobs, one for twenty years, and the other for fourteen.

In short, appellate counsel Stewart failed to present significant mitigating evidence about Ferrell's upbringing and mental health, although it was readily available if counsel had inquired further. Again, the totality of mitigating evidence in this case is very significant, when compared to the aggravators. And again, we conclude that there was a reasonable probability that the outcome of his motion for new trial would have been different. Moreover, even if measured against AEDPA deference, we would still find on this record, if the Georgia Supreme Court is

thought to have implicitly reached the issue of appellate counsel's prejudice, that the court's conclusion was an unreasonable one.

Since Ferrell has established both <u>Strickland</u> factors -- deficient performance and prejudice -- we reverse the district court's ruling on his ineffective-assistance-of-appellate-counsel claim, and grant the habeas petition for this reason as well.[20]

## V.

Lastly, Ferrell claims that his constitutional rights were violated because the Public Defender's Office that represented him also represented his two uncles, Robert and Fred Lowe, who had killed Wimp Hinton a few weeks before Ferrell killed his grandmother (the uncles' mother) and his cousin. The Lowe brothers lived with their mother, and Ferrell's theory of defense from the start was that someone else had killed his grandmother and cousin in revenge for the earlier murder committed by his uncles. Ferrell also points out that during trial, his uncle Fred arranged for Wimp Hinton's son, Tony Hinton, to testify for the prosecution in Ferrell's trial that the Hinton family held no animosity for the Ferrell family, undermining Ferrell's revenge killing defense. Like the district court before us, we

---

[20] Inasmuch as we have granted Ferrell habeas relief from his sentence, we have no occasion to address his claim that due to the seizure he sustained in court, he was constructively absent from the courtroom at sentencing.

are unpersuaded that the Georgia Supreme Court's determinations were unreasonable.

The Sixth Amendment guarantees criminal defendants the right to the effective assistance of counsel. Strickland, 466 U.S. at 686; Hamilton v. Ford, 969 F.2d 1006, 1011 (11th Cir. 1992), cert. denied, 507 U.S. 1000 (1993). A lawyer who represents multiple defendants with conflicting interests cannot provide sufficient legal assistance to satisfy the Sixth Amendment's command. Holloway v. Arkansas, 435 U.S. 475, 481 (1978). "[W]hen counsel is burdened with a conflict of interest, she 'breaches the duty of loyalty, perhaps the most basic of counsel's duties' and has therefore failed to provide effective assistance of counsel." Hamilton, 969 F.2d at 1011 (quoting Strickland, 466 U.S. at 692).

## A. The state trial court conducted an adequate inquiry into the conflict issue.

In Holloway, the United States Supreme Court held that a criminal defendant who objects to his representation based on a conflict of interest prior to trial need not demonstrate the existence of actual prejudice. 435 U.S. at 490-91. The Court recognized that when counsel represents conflicting interests, actual prejudice to the defendant can be extraordinarily difficult to demonstrate, as "the evil . . . is in what the advocate finds himself compelled to refrain from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing

89

process." Id. at 490. Since <u>Holloway</u>, we have held that "where there is both a timely objection <u>and</u> the trial court fails to appoint separate counsel or to inquire adequately into the possibility of a conflict of interest, the reversal will be automatic." <u>Hamilton</u>, 969 F.2d at 1012 (emphasis in original).

As the record shows, the Petitioner raised a timely objection to his representation by counsel encumbered by an alleged conflict of interest. At several hearings, Ferrell expressed objection to being represented by the Public Defender's Office. In response to Ferrell's first objection, the court asked trial counsel to investigate and determine by the following day whether they believed they could represent Petitioner conflict-free. (RE2 at 6). At the next proceeding, on April 8, 1988, the trial court inquired further of trial counsel. (R3 at 3-4). Schnieder answered the court this way:

> It does not appear that we have a conflict of interest in the case that would bar us from representing him. The only possible complication would involve a related murder case . . . in which Mr. Ferrell's uncles are defendants . . . that happened only a few days before this incident . . . [in] which Mr. Snead of our office represents those defendants. But I don't believe there is any obstacle at this point to our representing him.

(RE3 at 4). The trial court then inquired whether the uncles participated "in any way, shape or form in this case." Id. Trial counsel responded:

> No, sir. No, sir. The two defendants in that case were in jail at the time this occurred . . . . There are indications that . . . there may be a

90

connection, in that this defendant has made statements indicating that . . . . the victim in the first case . . . his family or associates may have been involved . . . in a retaliation murder in this case. It's at an early stage of development, Your Honor, and I don't believe that would cause a conflict; I think the . . . position of . . . the two defendants in the first case . . . and the defendant in this case would be consistent and not in conflict . . . .

(RE3 at 4-5).

Following another objection raised by Ferrell, the trial court instructed defense counsel: "I'll take note of what you told us, and I'll ask that Mr. Schnieder talk to Mr. Siemon, and see if that presents any kind of particular problem." (RE3 at 7).[21] After yet another objection by Ferrell, the trial court explained that trial counsel had been instructed to investigate the matter and report back to the court about whether there was any conflict. (Id. at 7-8). At the close of the April 8 hearing, the trial court further instructed counsel: "Make sure that all witnesses are interviewed. It may be necessary to interview those two uncles, as a matter of fact, to find out what the story is for sure, as well as any other potential witnesses in this case." (RE3 at 14-15).

On July 29, 1988, at a pre-trial hearing, defense counsel informed the court that the Lowe brothers' cases were still pending in trial court and that in the event

---

[21] There is no indication that Schneider ever spoke with Siemon. However, there is nothing to suggest that Siemon would have had any peculiar information about the Public Defender's representation of both Ferrell and his uncles.

91

the State sought to call either of them as witnesses at Ferrell's trial, then counsel would have a conflict of interest because then they would be required to cross-examine the Public Defender's other clients. (RE7 at 16-17). The trial court observed that since the State did not intend to call either of the uncles at Ferrell's trial, there did not appear to be any conflict. (Id. at 17). Ferrell's counsel later testified that they considered it a strategic victory for the defense that neither of the Lowe brothers would be called by the State.[22]

The facts are clear that the trial court, on numerous occasions, inquired into any potential conflict of counsel, and that trial counsel also investigated and reported to the trial court about any potential conflicts they could foresee. Courts generally defer to the judgment of the defense lawyer concerning the existence or absence of a disabling conflict. Mickens v. Taylor, 535 U.S. 162, 167-68 (2002);

---

[22] Counsel Sheffield testified during the motion for new trial hearing that the Lowe brothers were "firmly convinced that the story that [Petitioner] was telling was not true and that they both believed pretty adamantly, that [Petitioner] in fact had done the killing." (RE17 at 130). Pretrial investigation notes from Ferrell's counsel also established that Robert Lowe did not believe Petitioner's story was credible. (RE42 at 518). Robert Lowe added that Petitioner "lies a lot," and that "[Petitioner] used to take his family's monthly rent money and pay only half to the landlady, and they got evicted." (Id.; id. at 517 (Fred saying same)). Robert Lowe also relayed that "he would help in any way, but he couldn't lie for [Petitioner]" and "he believed [Petitioner] did the murders." (Id. at 519). Fred Lowe told defense counsel, "I know [Petitioner] killed my mama," and that he could not appear as a witness for him. (Id. at 517). Robert Lowe also completely discounted the revenge theory observing that no one had ever made any threats to his mother or to any of the family, and that while he was in jail he spoke to his mother twice a day and she never said anything about being afraid and having any problems with anyone. (Id. at 518-519). After interviewing Robert and Fred Lowe, and rather early during their investigation, defense counsel "became convinced that [they] didn't want to call [Robert or Fred Lowe] as witnesses because they were not gonna be favorable." (RE17 at 131, 138).

92

Holloway, 435 U.S. at 485. The primary reason for according deference is that an "attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial." Holloway, 435 U.S. at 485. Moreover, as an officer of the court, defense counsel has an obligation to promptly and honestly advise the court of a discovered conflict of interest. Id. at 486. In this case, Ferrell made the request for investigation of conflict. Defense counsel came to the reasoned conclusion that no disabling conflict existed and that no separate representation was required.[23]

Ferrell's defense counsel concluded that there would be no conflict if the prosecution chose not to call either of the uncles to testify. While we have not addressed this precise situation, defense counsel's conclusion finds support in other caselaw. See, e.g., United States v. McCullah, 76 F.3d 1087, 1099 (10th Cir. 1996) (finding adequate inquiry where potential witness causing potential conflict was

_____

[23] Ferrell argues that because he raised the issue himself, rather than his counsel, the principle of generally deferring to counsel's judgment should not apply. However, there is no reason that counsel, knowing the facts of the representations, could not investigate and report back to the court, even where the defendant raised the conflict. Because this issue focuses on the trial court's inquiry into the conflict, and necessarily depends on the lawyer's unique knowledge of both representations (rather than on the reasonableness of the lawyer's performance -- an issue the courts regularly assess), it raises different questions than were raised in United States v. Nicholson, 611 F.3d 191 (4th Cir. 2010), where the court discounted deferring to the lawyer when determining whether an actual conflict existed by exploring the reasonableness of counsel's alternative defense strategy.

93

disqualified from testifying). Still, other courts have concluded that a potential

conflict is not created simply because of the representation of defendants by

different attorneys in the same Public Defender's Office. See, e.g., United States v.

Trevino, 992 F.2d 64, 66 (5th Cir. 1993) ("The potential for such conflicts,

however, does not necessarily exist when . . . codefendants are represented by

different attorneys, albeit in the same public defender office."). In this case, the

trial court, after repeated inquiry, accorded some deference to the defense

counsel's appraisal of the potential for conflict, and then reasonably concluded that

no conflict barred defense counsel from representing Ferrell.

Nor are we persuaded by Ferrell's argument that the court should have

reinvestigated the conflict issue midway through trial, when witness Tony Hinton

testified at his uncle Fred's behest. As the record shows, the court repeatedly

asked counsel to investigate; counsel represented that there was no conflict at the

time; and counsel never told the court that anything had changed, even at the time

of Hinton's testimony. The trial court was entitled to defer to counsel's judgment,

especially where, as here, there is nothing to suggest that Hinton's testimony, even

if at Fred's behest, raised any conflict issue.

Ferrell speculates nevertheless that Fred Lowe pleaded to reduced charges

because he procured Hinton's testimony. He points out that before his trial, Fred

was facing voluntary manslaughter charges, but ultimately pleaded (one month after Ferrell's conviction) to involuntary manslaughter, facing a difference of 10 years of prison exposure. However, Ferrell has offered no evidence that Fred's assistance with Hinton's testimony was connected in any way to his plea bargain. Rather, the police file indicated that the murder of Wimp Hinton resulted from a drunken fight during a card game, and no one knew that Wimp Hinton had been stabbed until after the fact. (RE43 at 697-98, 700-09). Witnesses at the scene described it as a mutual fight, and one witness said that Wimp was "always trying to get something started." (RE43 at 708). Given the facts surrounding that crime, along with the nature and circumstances surrounding the plea bargains, there is precious little in this record to suggest that Fred's assistance with Hinton's testimony was related to his case.

Ferrell also claims that his trial counsel could have cross-examined Hinton as to why Fred asked him to testify or could have asked Fred himself. But since the record shows that Fred fully believed Ferrell killed his mother, there was no reason for counsel to explore Fred's motivations for procuring Hinton's testimony, even if that line of questioning would have been permitted.

In short, the Georgia Supreme Court's ruling that the trial court's inquiry into potential conflict, and its reliance on defense counsel's representations, were

95

sufficient to meet the requirements of the Sixth Amendment was not an unreasonable application of clearly established Supreme Court law.

**B.      Nor did Ferrell establish any actual conflict of interest.**

In Cuyler v. Sullivan, 446 U.S. 335 (1980), the Supreme Court held that to establish an ineffective assistance of counsel claim stemming from a conflict of interest where there was no objection at trial, a defendant "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Id. at 348. Two steps are required in this analysis: determining first, whether an actual conflict existed, and then, whether the conflict had an adverse effect on representation. Buenoano v. Singletary, 74 F.3d 1078, 1086 (11th Cir. 1996). According to Cuyler, a conflict must be actual, not merely speculative; the mere possibility of conflict does not constitute a Sixth Amendment violation. Id.; McConico v. Alabama, 919 F.2d 1543, 1546 (11th Cir. 1990); Smith v. White, 815 F.2d 1401, 1404 (11th Cir. 1987), cert. denied, 484 U.S. 863 (1987). Ferrell contends that, even if the inquiry into the potential conflict was sufficient to satisfy the standard outlined in Holloway, an actual conflict of interest rendered his trial counsel's assistance ineffective under Cuyler.

We have adopted the following test to determine whether actual conflict can be discerned:

96

> We will not find an actual conflict unless [the defendant] can point to specific instances in the record to suggest an actual conflict or impairment of [her interest]. The defendant must make a factual showing of inconsistent interests and must demonstrate that the attorney made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence that favors an interest in competition with that of the defendant. If [the attorney] did not make such a choice, the conflict remained hypothetical.

Buenoano, 74 F.3d at 1086 n.6 (quoting Smith, 815 F.2d at 1404 (internal citations and quotation marks omitted)).

Ferrell cites out-of-circuit case law to suggest that actual conflict can be established by circumstantial evidence, or, where there is a clear suggestion from an attorney's conduct that a conflict exists. No circumstantial evidence or clear suggestion of a conflict can be found here. Ferrell has offered only speculation of an actual conflict based on the fact that his counsel never questioned the Lowes on the stand about their motivation for getting Hinton to testify and never cross-examined Hinton about Fred Lowe's motivation for procuring his testimony.

There is ample evidence, however, to support his counsel's explanation that preventing the Lowes from testifying at all was a strategic victory for the defense. Again, the pretrial investigation forms reported that both Fred and Robert Lowe told counsel that they believed Ferrell had committed the murders. Sheffield testified, and the Georgia Supreme Court found as a fact, that it was his understanding that the Lowes brothers were "firmly convinced that the story that

97

[Petitioner] was telling was not true and that they both believed pretty adamantly, that [Petitioner] in fact had done the killing." (RE17 at 130). Even when approached by appellate counsel well after he reached a plea agreement with the State, Fred Lowe remained "hostile" and refused to cooperate with her. (RE40 at 41). And in his state habeas affidavit, Robert Lowe explained that he told Ferrell's trial counsel he thought "Eric did it because there was no way I wanted to get involved in Eric's case with my case still pending," (RE41 at 216).

Lowe never said that he didn't believe Ferrell killed his mother, or that he didn't testify because of some deal with the State, or because of advice from his counsel. Nor did Fred Lowe ever submit an affidavit on habeas that attested to any of Ferrell's claims. In short, there is nothing in the record to undermine trial counsels' stated view that they did not want the Lowes to testify because each of them believed Ferrell had committed the murders. Nor does the record support Ferrell's speculation that Fred procured Tony Hinton's testimony because of some deal with the State.

The record also does not support Ferrell's claim that conflict somehow prevented defense counsel from cross-examining Hinton about Fred's motivation for soliciting Hinton's testimony. As an initial matter, it is unclear that Hinton would have even been permitted under the hearsay rules to testify about Fred

98

Lowe's motivations. But in any event, as we've detailed, the evidence does not show that Fred solicited Hinton's testimony for any reason other than because he believed Ferrell killed his mother.

Moreover, Ferrell's suggestion that Hinton's testimony -- that his family was not seeking retribution from the Lowe family, thereby undercutting Ferrell's defense theory -- was "devastating" is meritless. Indeed, Hinton's testimony was, at best, self-serving because it suggested only that Hinton had nothing to do with the murders of Ferrell's grandmother and cousin. This can hardly be characterized as "devastating."

Finally, there is no merit to Ferrell's claim that questioning the Lowes about their motivations was so important that it would have outweighed any harm from the Lowes repeatedly stated view that Ferrell killed their mother. As we see it, the Lowes' testimony that they believed their nephew killed their mother would have far outweighed any purported benefit from establishing that they were biased or that their bias resulted in Hinton's testimony, or in telling the police to look for a gun at Ferrell's home (which, in any event, is irrelevant since Ferrell admitted he had the gun). In short, we do not see how Ferrell has shown that there was any actual conflict resulting from being represented by the Public Defender's Office. The Georgia Supreme Court's holding was neither contrary to nor an unreasonable

application of clearly established Supreme Court law.  And, since Ferrell has not shown any error in the Georgia Supreme Court's rejection of his conflict-of-interest claim, he cannot establish that appellate counsel rendered ineffective assistance of counsel in presenting this claim.

## VI.

In sum, we reverse the district court's order insofar as it denied habeas relief on Ferrell's claim of ineffective assistance of trial and appellate counsel in investigating and presenting mitigating evidence at the penalty phase, but affirm the district court's denial of his conflict-of-counsel claim.

**REVERSED IN PART, AND AFFIRMED IN PART.**